UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X

VINCENT R. CAUTILLO,

                       Plaintiff,

              v.

NANCY A. BERRYHILL, Acting Commissioner
of Social Security,

                     Defendant.

--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 12, 2018

17 Civ. 1356 (KPF) (DCF)

OPINION AND ORDER
ADOPTING REPORT AND
RECOMMENDATION

KATHERINE POLK FAILLA, District Judge:

Pending before the Court is the February 20, 2018 Report and Recommendation from United States Magistrate Judge Debra C. Freeman (the "Report") recommending that Plaintiff Vincent Cautillo's petition for Social Security Disability Insurance benefits ("SSDI") under Title II of the Social Security Act of 1935 be remanded for further administrative proceedings. For the reasons set forth below, the Court finds no error in the Report and adopts it in its entirety.

## BACKGROUND

This summary draws its facts from the detailed recitation in the Report, to which neither party objects. (*See* Report 1-23). Plaintiff worked as a "heavy equipment mechanic" for nearly 20 years. (*Id.* at 2). Plaintiff injured his neck in a motor vehicle accident in 2007, and he underwent cervical spine surgery. (*Id.*). In 2011, Plaintiff experienced back and hip pain while at work, and by May 2012 he stopped working. (*Id.* at 2-3). On November 14, 2012, Plaintiff

filed an application for SSDI benefits, alleging a "disability as of May 26, 2012, due to a bulging disc injury, cervical spinal impairment, degenerative disc disease, herniated disc, lumbar spine impairment, severe back pain, hip pain, right knee impairment, and a mass on his adrenal gland." (*Id.* at 1-2). In 2013, Plaintiff was declared "permanently incapacitated" by the Office of the New York State Comptroller, and his application for disability retirement was granted. (*Id.*).

Plaintiff's SSDI claim was denied on April 2, 2013; he requested a hearing and ultimately testified in two hearings before Administrative Law Judge ("ALJ") Robert Gonzalez. (Report 2). Plaintiff was represented by counsel. (*Id.*). On June 19, 2015, ALJ Gonzalez ruled that Plaintiff could perform sedentary work with some limitations. (*Id.*). On January 4, 2017, the Appeals Council denied Plaintiff's request for review. (*Id.*). This action followed.

The parties filed a Joint Stipulation on October 19, 2017; Plaintiff sought a reversal of the ALJ's decision or, alternatively, remand for further proceedings. (Report 22). Plaintiff argued that the ALJ failed to follow the treating physician rule, failed to develop the record as to certain evidence, erred in assessing Plaintiff's credibility, and erred in his determination that Plaintiff could continue to perform sedentary work. (*Id.* at 22-23).

While agreeing with several of Defendant's arguments, Judge Freeman ultimately recommended that this Court remand the matter to the Social

Security Administration with certain specific directives. Judge Freeman found, first, that the ALJ had failed to follow the treating physician rule, *see* 20 C.F.R. § 404.1527(c)(2), in considering the medical opinions proffered by treating neurosurgeon Dr. Kaushik Das and treating psychiatrist Dr. Mitchell Cabisudo. (Report 46-62). These errors, in turn, led to errors in the ALJ's assessment of Plaintiff's credibility. (*Id.* at 63-68; *see id.* at 64 ("This Court agrees that the ALJ's assessment of Plaintiff's credibility was infected by the ALJ's improper weighing of the opinion evidence, particularly that of Dr. Das, and that, while Defendant is correct that the ALJ was 'not required to discuss every piece of evidence submitted' (Joint Stip., at 31), the evidence that the ALJ chose to discuss in his credibility evaluation did not accurately portray the medical record as a whole.")). Additionally, these errors called into question the ALJ's determination of Plaintiff's residual functional capacity ("RFC"). (*Id.* at 68-70).

## DISCUSSION

In reviewing a Magistrate Judge's report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Where, as here, no timely objections have been filed, "a district court need only satisfy itself that there is no clear error on the face of the record." *King* v. *Greiner*, No. 02 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009) (internal quotation marks and citation omitted), *aff'd*, 453 F. App'x 88

(2d Cir. 2011) (summary order). "A party's failure to object to a report and recommendation, after receiving clear notice of the consequences of such a failure, operates as a waiver of the party's right both to object to the report and recommendation and to obtain appellate review." *Grady* v. *Conway*, No. 11 Civ. 7277 (KPF) (FM), 2015 WL 5008463, at *3 (S.D.N.Y. Aug. 24, 2015) (citing *Frank* v. *Johnson*, 968 F.2d 298, 300 (2d Cir. 1992)).

Judge Freeman's Report was issued on February 20, 2018, and objections were due on March 6, 2018. Neither party has objected to the Report. Because the parties, both of whom are counseled, have not filed objections, the parties have waived their right to object and to obtain appellate review. Even so, the Court has reviewed the Report and finds that its reasoning is sound and it is grounded in fact and law. Accordingly, the Court finds no clear error and adopts the Report in its entirety.

## CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Freeman's Report in full. Accordingly, it is hereby ordered that Plaintiff's motion for judgment on the pleadings is GRANTED, Defendant's cross-motion for judgment on the pleadings is DENIED, and the case is REMANDED for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

SO ORDERED.

Dated:     March 12, 2018
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VINCENT R. CAUTILLO,

                          Plaintiff,

          -against-

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                          Defendant.

17cv01356 (KPF) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE KATHERINE P. FAILLA, U.S.D.J.:**

Plaintiff Vincent R. Cautillo ("Plaintiff") seeks review of the final decision of defendant

Nancy A. Berryhill, Acting Commissioner of Social Security ("Defendant" or the

"Commissioner"), denying Plaintiff Social Security disability insurance ("SSDI") benefits under

Title II of the Social Security Act (the "Act") on the ground that Plaintiff's impairments did not

constitute a disability for purposes of the Act.  Currently before this Court for a report and

recommendation is the parties' Joint Stipulation in Lieu of Motion for Judgment on the

Pleadings, dated October 19, 2017 ("Joint Stip.") (Dkt. 16), in which the parties have set out the

issues and their positions with respect thereto.

For the reasons set forth below, I respectfully recommend that this case be remanded for

further administrative proceedings.

**BACKGROUND**[1]

Plaintiff filed an application for SSDI benefits on November 14, 2012.  (R. at 234-35.)

He alleged disability as of May 26, 2012, due to a bulging disc injury, cervical spine impairment,

---

[1] The background facts set forth herein are taken from the 1,551-page Social Security
Administration Administrative Record (Dkt. 12) (referred to herein as "R." or the "Record").

degenerative disc disease, herniated disc, lumbar spine impairment, severe back pain, hip pain, right knee impairment, and a mass on his adrenal gland.  (*Id.* at 251.)  After his claim was initially denied on April 2, 2013 (*id.* at 139-47), Plaintiff requested a hearing before an administrative law judge ("ALJ") (*id.* at 148).  On May 20, 2014, ALJ Robert Gonzalez held an initial hearing, at which he heard testimony from Plaintiff, who was represented by counsel.  (*Id.* at 67-93.)  The ALJ held a supplemental hearing on August 1, 2014, primarily to hear testimony from vocational expert ("VE") Louis Szollosy.  (*Id.* at 94-126, 220-21.)  In a decision dated June 19, 2015, the ALJ found that, although Plaintiff had a number of severe impairments (*id.* at 31), Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), with some limitations (*id.* at 34).  The Appeals Council denied Plaintiff's request for review on January 4, 2017 (*id.* at 1-6); thereafter, the ALJ's decision became the final decision of the Commissioner.  Plaintiff now challenges the Commissioner's denial of benefits.

## A.  Plaintiff's Personal and Employment History

Plaintiff was born on January 20, 1967 (*id.* at 247) and was 45 years old as of his alleged disability onset date.  The Record reflects that, at the time of his second hearing before ALJ Gonzalez, Plaintiff lived with his daughter in Orange County.  (*Id.* at 78, 109.)  Plaintiff completed high school and one year of college before working as a heavy equipment mechanic for the Town of Clarkstown for 17 or 18 years.  (*Id.* at 102, 105, 114, 251.)  His work involved the maintenance and repair of municipal machines, such as garbage trucks, loaders, and backhoes.  (*Id.* at 105.)

Plaintiff was involved in a motor vehicle accident in July 2007 that caused an injury to his neck, requiring cervical spine surgery.  (Joint Stip., at 2; R. at 802.)  On August 24, 2011,

Plaintiff was mounting truck tires at work and felt pain in his back, right hip, and right leg, at which point he sought pain management treatment. (*Id.*) Plaintiff stopped working on May 26, 2012 because of his physical impairments. (R. at 80-82, 247.) On December 17, 2013, the Office of the New York State Comptroller found that Plaintiff was "permanently incapacitated," and granted his application for disability retirement under Article 15 of New York's Retirement and Social Security Law. (*Id.* at 743.) As of the second hearing before the ALJ, Plaintiff was receiving a New York State disability pension of $1,545 per week. (*Id.* at 103.)

**B.**     **Medical Evidence**

Given the voluminous medical records in this case, this Court will not engage in a full description of Plaintiff's medical records here. Rather, relevant aspects of those records will be discussed *infra* in connection with this Court's review and evaluation of the ALJ's decision. Briefly, though, Plaintiff's medical history, and the medical opinion evidence contained in the Record, may be summarized as follows:

**1.**     **Treatment for Spinal Conditions by Dr. Kaushik Das (Neurosurgeon)**

Plaintiff had a treating relationship with Dr. Kaushik Das, a neurosurgeon, whom Plaintiff saw approximately 20 times between June 25, 2008 and July 27, 2014. Dr. Das performed Plaintiff's spinal surgeries, including his cervical spine operation around August 2008 (*id.* at 805); a hemilaminectomy[2] and foraminotomy[3] on May 29, 2012 (*id.* at 442, 561); and a

---

[2] A hemilaminectomy is "[a] procedure to relieve pain . . . from an irritated nerve root pinched by bony segments of the spinal processes." (Joint Stip., at 2 n.1.)

[3] "A foraminotomy is a spinal procedure that partially removes one or both of the facet joints on a set of vertebrae" in order to "decompress the spinal nerves being pinched by degenerated facet joints." (Joint Stip., at 2 n.2.)

laminectomy,[4] lumbar interbody fusion and decompression,[5] and segmental instrumentation[6] on May 30, 2013 (*id.* at 1109-10, 1117-19). Dr. Das provided four pieces of opinion evidence (*see id.* at 776-82 (spinal impairment questionnaire, dated Dec. 11, 2012), 701-02 (narrative report, dated Feb. 26, 2013), 742 (letter dated Dec. 4, 2013), 793-800 (multiple impairment questionnaire, dated May 14, 2014)), as well as a letter of explanation in response to a request for clarification from the ALJ (*id.* at 1134-35 (letter dated July 27, 2014)).

Specifically, in a December 2012 spinal impairment questionnaire, Dr. Das opined that Plaintiff's prognosis for full recovery from his spinal impairments was "poor" (*id.* at 776), and indicated positive clinical findings concerning limitations to Plaintiff's range of motion in the cervical and lumbar spine, tenderness in the lumbar spine, muscle spasm in the cervical and lumbar spine, and a positive straight-leg raising test in the right leg at 60 degrees (*id.* at 776-77). Dr. Das indicated that Plaintiff had "severe" and "constant" pain in his back and sometimes his right leg (*id.* at 778), which would limit him to sitting for not more than three hours, and standing or walking for not more than three hours, in an eight-hour workday (*id.* at 779), with the need to get up to move around every 30 minutes (*id.*), and to rest for 15 minutes every one to two hours (*id.* at 781). Dr. Das further indicated in the questionnaire that Plaintiff could frequently lift or

---

[4] "A laminectomy is a type of back surgery used to relieve compression on the spinal cord," in which the lamina – "part of the bone that forms the vertebral arch in the spine" – is removed. (Joint Stip., at 3 n.8.)

[5] "Posterior lumbar interbody fusion . . . is a spinal fusion surgical approach to fuse the disc space of the spine through entering from the back of the body." (Joint Stip., at 3 n.7.)

[6] Instrumentation involves the surgical implantation of titanium, titanium-alloy, stainless steel, or non-metallic stabilizing devices into the spine. Jason M. Highsmith, MD, *What Is Spinal Instrumentation and Spinal Fusion?*, SPINE UNIVERSE, https://www.spineuniverse.com/treatments/surgery/what-spinal-instrumentation-spinal-fusion.

carry up to five pounds, could occasionally lift or carry up to 20 pounds,[7] could never left or

carry more than 20 pounds, could not push, pull, kneel, bend, or stoop, and would likely be

absent from work two or three times per month.  (*Id.* at 776-82.)

In his February 26, 2013 letter, Dr. Das then stated that he "believe[d] [Plaintiff's]

injuries to be permanent and [could] only be controlled with pain management and intermittent

physical therapy for symptom control," and that Plaintiff was "totally disabled from working"

with a "75 [percent] permanent marked disability."  (*Id.* at 702.)  Similarly, in his letter dated

December 4, 2013, Dr. Das reiterated that Plaintiff was "permanently totally disabled from

working."  (*Id.* at 742.)

In a May 2014 multiple impairment questionnaire, Dr. Das again indicated Plaintiff's

"poor" prognosis; paraspinal muscle spasm in the thoracolumbar region; and limited range of

motion in the cervical and lumbar spine.  (*Id.* at 793.)  Similar to what he reported in the earlier,

December 2012 questionnaire, Dr. Das also indicated in May 2014 that Plaintiff had "constant"

pain, this time stated to be in the mid and low back, right flank, and right hip (*id.* at 794-95);

Dr. Das described this pain as "sharp [and] burning" (*id.* at 794), and as being treated with

narcotic pain medications and muscle relaxants, which reportedly caused side effects that

included drowsiness, fatigue, and impaired concentration (*id.* at 797).  At this point, Dr. Das

wrote that, in an eight-hour workday, Plaintiff could sit for three hours, and stand or walk for two

hours (*id.* at 795), and that he would need to get up and move around every 20 to 30 minutes

(*id.*), with rest breaks of 10 to 15 minutes, every one to two hours (*id.* at 798).  Dr. Das further

indicated that Plaintiff's "experience of pain, fatigue or other symptoms" were "frequently"

---

[7] Dr. Das actually wrote in his spinal impairment questionnaire that Plaintiff could "never" *lift* up to 20 pounds, but also that he could "occasionally" *carry* up to 20 pounds.  (R. at 779-80.)  This Court assumes this seeming inconsistency was an error.

"severe enough to interfere with [his] attention and concentration" (*id*. at 798); that he was "incapable of even 'low stress' in the workplace, as a result of pain, narcotic pain medication, and the need for frequent rest breaks (*id*.), and that Plaintiff was likely, on average, to be absent from work "[m]ore than three times a month" (*id*. at 799). Dr. Das also indicated that Plaintiff could lift or carry up to five pounds frequently, up to 20 pounds occasionally, and never more than 20 pounds; that Plaintiff had no limitations using fingers or hands for fine manipulations, but moderate limitations in grasping, turning, or twisting objects with both of the upper extremities, and in reaching, including overhead, with both of the upper extremities; that Plaintiff's ability to push and pull was limited; that Plaintiff would need to avoid fumes, gases, temperature extremes, and heights; and that he could not kneel, bend, or stoop. (*Id.* at 796-97, 799.)

Finally, in his letter to the ALJ clarifying his opinion evidence, Dr. Das – despite his earlier reports detailing Plaintiff's additional limitations – appeared to agree with the opinion of the consultative examiner, neurosurgeon Dr. Walter J. Levy (*see* Background, *infra*, at Section B(4)(b)), to the following extent:

> Please refer to the Independent Medical Review performed by [the consultative examiner] on April 16, 2013 for further concurrence. As quoted by [the consultative examiner], "[Plaintiff] should currently be able to do light duty work, with a 10lb lifting limit, avoiding frequent turning, lifting and bending, and avoiding lifting above shoulder level."

(*Id.* at 1134.)

## 2. Other Treatment for Plaintiff's Physical Conditions

Dr. Das referred Plaintiff to Dr. Jin Li, a neurologist (*see id.* at 703), who examined Plaintiff on three separate occasions (*id.* at 713-14 (Mar. 8, 2012), 692-94 (Aug. 10, 2012), 703-04 (Feb. 28, 2013)). On February 28, 2013, Dr. Li provided a report, in which she reported

a number of normal findings, but also indicated that Plaintiff had "muscle spasm of [the] bilateral lumbar and lower paraspinal muscles" (*id.* at 703), and that, although his "L5 radiculopathy [had] significantly improved after surgical intervention" and he had received "instant pain relief" to his thoracic regions after five separate trigger-point injections, his lumbar pain was nonetheless persisting, and he continued to require narcotics, as well as muscle relaxants (*id.* at 703-04). In sum, Dr. Li stated that Plaintiff had "persistent lumbar radiculopathy with muscle spasm not responsive to treatment," and was "still in significant pain," such that he was "not able to work full-time." (*Id.* at 704.)

On the same date as her written report, Dr. Li also provided a spinal impairment questionnaire, in which she diagnosed Plaintiff with "[l]umbosacral radiculopathy [with] muscle spasm of [the] lumbosacral paraspinal muscles," and listed clinical findings for Plaintiff's lumbar region that specifically included decreased range of motion, tenderness, muscle spasm, sensory loss (including to the left lateral thigh), and trigger points at the lumbosacral paraspinal muscles. (*Id.* at 744-45.) Similar to Dr. Das's reported findings (*see supra*), Dr. Li indicated that Plaintiff's pain in his lower back was "constant" (*id.* at 746), and she added that his trigger point injections were "too short lasting" (*id.* at 748). Nonetheless, she opined that Plaintiff could sit for up to eight hours and stand or walk for up to four hours in an eight-hour day, provided he could get up and move around every hour (*id.* at 747). She also opined that Plaintiff could lift up to five pounds frequently, that he could lift or carry up to 20 pounds occasionally, and that he could not push, pull, kneel, bend, or stoop. (*Id.* at 747-48, 750.)

Dr. Das also referred Plaintiff to Dr. Adam Lazzarini, an orthopedic surgeon (*see id.* at 695), who saw Plaintiff a total of about 10 times between July 13, 2012 and June 18, 2014.

Dr. Lazzarini performed Plaintiff's right hip arthroscopy,[8] labral debridement,[9] and debridement of a CAM lesion[10] on November 8, 2012 (*id.* at 498, 518-20, 687-89), and, on August 22, 2014, a right knee arthroscopy with partial medial meniscectomy,[11] excision of the medial plica,[12] chondroplasty[13] of the femoral and tibial medial and lateral compartments,[14] and chondroplasty with microfracture of the femoral trochlea[15] (*id.* at 1539-41). Dr. Lazzarini did not provide a medical opinion regarding the extent of any functional impairments related to Plaintiff's hip or knee, although his progress notes, as noted *infra*, discuss his clinical findings over the period that he was following Plaintiff for both.

For his general healthcare needs, Plaintiff regularly visited Crystal Run Healthcare ("Crystal Run") between August 31, 2012 and May 22, 2014, seeing treatment providers Drs. Michael E. Hoffman, Riaz Rahman, and Anthony Nici, and Adult Nurse Practitioner

---

[8] "Hip arthroscopy is a surgical procedure that allows doctors to view the hip joint without making a large incision . . . through the skin and other soft tissues." (Joint Stip., at 3 n.4.)

[9] "The goal of a labral debridement surgery is to trim back the torn area of the labrum in order to lower the risk of further tearing." (Joint Stip., at 3 n.5.)

[10] "A CAM lesion is the formation of extra bone on the head of the femur . . . resulting in a 'bump.'" (Joint Stip., at 3 n.6.)

[11] "An arthroscopic meniscectomy is a procedure to remove some or all of [the] meniscus from the tibio-femoral joint of the knee using arthroscopic (keyhole) surgery." (Joint Stip., at 4 n.9.)

[12] "A plica is a fold of synovial membrane most commonly in the anteromedial aspect of the knee" that is "present in about 50% of the population." (Joint Stip., at 4 n.10.)

[13] "Chondroplasty refers to surgery of the cartilage." (Joint Stip., at 4 n.11.)

[14] "The knee joint is at the juncture of the femur . . . and the tibia . . . . The femur is attached to the tibia by ligaments. The patella . . . is at the front of the knee joint. The joint consists of three 'compartments' or sections: [m]edial [c]ompartment (inner half of [the] knee); [l]ateral compartment (outer half of [the] knee); [and] [p]atellofemoral compartment (behind the knee cap)." (Joint Stip., at 4 n.12.)

[15] "Femoral trochlea is the articular surface on the cranial aspect of the distal femur upon which the patella glides." (Joint Stip., at 4 n.13.)

("ANP") Lura Wendy Marks ("Marks"),[16] among others.[17]  The ALJ relied in part on Marks'

opinion that Plaintiff was "disabled as a heavy equipment mechanic," which she included in a

treatment note dated April 17, 2014.  (*Id.* at 1166-70.)  Marks' "review of systems" on that date

revealed spasm and pain in Plaintiff's right thoracic spine and "upper quadrant."  (*Id.* at 1167.)

Plaintiff reported to Marks that his pain was 7/10, with "aching, burning, sharp, stabbing, tender,

[and] throbbing" qualities, that he had been living with pain for three years, that his pain was

relieved by pain medications, and worsened by sitting, sleeping, and walking.  (*Id.* at 1168.)

Upon physical exam, Marks noted Plaintiff's normal gait and stride, lack of antalgia,[18] normal

heel-toe progression, and normal heel-walk and toe-walk.  (*Id.*)  Plaintiff's cervical spine

alignment was normal; he had tenderness to palpation over his paraspinal musculature and

paraspinous processes bilaterally; his sensation to light touch was intact bilaterally; he had full

muscle strength in his shoulders, arms, wrists, fingers, and lower extremities; his Spurling's

test[19] was negative, but a seated/supine straight-leg raise test was positive; he had normal range

of motion in the spine upon flexion, extension, and lateral bending, and no pain with flexion,

---

[16] Marks is identified as "Lura Wendy" in the ALJ's decision (*id.* at 42), as well as in the parties' joint submission (*see* Joint Stip., at 23).

[17] Based on the Record, Plaintiff received treatment at Crystal Run, at minimum, twice in 2012 (*see* R. at 1375-77 (8/31/12, Dr. Hoffman), 1363-65 (12/21/12, Dr. Hoffman)); eight times in 2013 (*see id.* at 1356-58 (2/7/13, Dr. Hoffman), 1349-51 (3/7/13, Dr. Hoffman), 1334-37 (4/19/13, Dr. Rahman), 1325-29 (4/25/13, Dr. Rahman), 1306-10 (5/15/13, Dr. Rahman), 1288-90 (7/11/13, Dr. Hoffman), 1278-80 (10/24/13, Dr. Hoffman), 1265-69 (10/28/13, Dr. Rahman)); and nine times in 2014 (*see id.* at 1258-61 (1/24/14, Dr. Rahman), 1247-52 (1/28/14, Dr. Nici), 1229-32 (2/27/14, Dr. Hoffman), 1211-14 (3/8/14, Dr. Nici), 1203-04 (3/21/14, Dr. Nici), 1176-80 (4/1/14, Dr. Rahman), 1166-70 (4/17/14, Marks), 1151-56 (4/29/14, Dr. Nici), 1548-49 (5/22/14, provider name cut off)).

[18] Antalgia refers to a gait abnormality that indicates an effort to avoid pain.  *Medical Definition of Antalgic*, https://www.merriam-webster.com/medical/antalgic.

[19] The Spurling's test is used to look for cervical nerve root compression causing cervical radiculopathy.  *Spurling's Test*, https://www.physio-pedia.com/Spurling%27s_Test.

extension, or lateral bending; and he had no tenderness to palpation over the greater trochanters on either side, nor the bilateral piriformis muscles, but had tenderness over the thoracic and lumbar spinous processes and paraspinals.  (*Id.* at 1168-69.)  Marks assessed Plaintiff as having right-sided thoracic and upper quadrant abdominal pain from possible thoracic spondylosis, as well as myofascial and radicular pain.  (*Id.* at 1169.)  She indicated that she was awaiting an x-ray of Plaintiff's thoracic spine and wrote that, based on the results, Plaintiff could seek "interventional pain management."  (*Id.*)

Additionally, Plaintiff underwent physical therapy two to three times a week for his back, hip, and knee at Move Physical Therapy, during the period from June 25, 2012 through July 2, 2014.  (*See id.* at 883-85, 870-81, 883-1108, 1484-96.)

### 3.     Mental Health Treatment by Dr. Mitchell Cabisudo (Psychiatrist) and Barry Bachenheimer (Licensed Clinical Social Worker)[20]

With respect to his mental health, Plaintiff saw a psychiatrist, Dr. Mitchell Cabisudo, regularly – at least 10 times – between April 17 and October 14, 2013, and the Record also contains progress notes for visits on December 4, 2013 and February 4, 2014.  (*Id.* at 723-41, 755-62.)  Dr. Cabisudo's psychiatry progress notes for Plaintiff indicate diagnoses for generalized anxiety disorder and depressive disorder.  (*See, e.g.*, *id.* at 738.)  Dr. Cabisudo completed a psychiatric/psychological impairment questionnaire on April 26, 2014, indicating that he had last seen Plaintiff on April 8, 2014, although the Record contains no treatment note for that date.  (*Id.* at 859-65.)  In that questionnaire, Dr. Cabisudo listed Plaintiff's diagnoses as

---

[20] While licensed clinical social workers are considered medical sources, they are not considered "acceptable" medical sources.  20 C.F.R. § 404.1513(a); SSR 06-03p, 2006 WL 2329939, at *2.  Evidence from social workers may, however, be used "to show the severity of the [claimant's] impairment(s) and how it affects the [claimant's] ability to function."  SSR 06-03p, 2006 WL 2329939, at *2.

including generalized anxiety disorder and depression, not otherwise specified (*id.* at 859), and listed positive clinical findings in support of his diagnoses, including poor memory, appetite disturbance with weight change, sleep and mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, difficulty thinking or concentrating, blunt, flat, or inappropriate affect, decreased energy, and generalized persistent anxiety (*id.* at 860).

Dr. Cabisudo also provided medical opinions regarding the extent of Plaintiff's mental impairments. Specifically, he opined that Plaintiff was "markedly limited" in his ability to remember locations and work-like procedures, to interact appropriately with the general public, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to travel to unfamiliar places or use public transportation, and to set realistic goals or make plans independently; he further opined that Plaintiff was "moderately limited" in his ability to understand, remember, and carry out either simple or detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, to sustain a routine without supervision, to work in coordination with others without being distracted by them, to make simple work-related decisions, to ask simple questions or request assistance, to respond appropriately to changes in the work setting, and to be aware of normal hazards and take appropriate precautions; and he stated that, on the available evidence, he could not evaluate Plaintiff's ability to accept instructions and to respond appropriately to criticism. (*Id.* at 859-64.) Dr. Cabisudo also indicated his view that Plaintiff would be absent from work more than three times per month. (*Id.* at 865.)

As noted in the ALJ's decision (*id.* at 43), the Record also contains a later note from Dr. Cabisudo, dated October 6, 2014, which states: "Patient is severely despondent, [with] suicidal ideation, noncompliance with meds, severe anxiety, no appetite, compromising his health, poor sleep, unable to take care of himself medically" (*id.* at 1542). This note is typed on a prescription form, but it does not indicate a prescription, and no back-up treatment records from Dr. Cabisudo are included in the Record, to place this note in context.

Plaintiff also had a therapist, Barry Bachenheimer ("Bachenheimer"), a licensed clinical social worker; as of May 12, 2014, Plaintiff was seeing Bachenheimer once per week. (*See id.* at 783-90.) Bachenheimer similarly provided opinion evidence in the form of a psychological impairment questionnaire. (*Id.* at 783-90.) In the questionnaire, Bachenheimer stated that Plaintiff was diagnosed with "Generalized Anxiety" and gave Plaintiff a "guarded" prognosis, stating that Plaintiff "would be unable to work in [the] job he had been doing due to physical limitations." (*Id.* at 783.) Bachenheimer also noted that the Plaintiff's primary symptoms were "physical pain," and feelings of "depress[ion]" and "frustration" stemming from his "not being able to do the things he used to do due to physical pain." (*Id.* at 785.)

Bachenheimer identified the following positive clinical findings that demonstrated or supported his stated diagnosis: sleep and mood disturbance, decreased energy, obsessions, generalized persistent anxiety, and hostility and irritability. (*Id.* at 784.) He also opined, however, that Plaintiff had no evidence of limitation in his ability to understand and remember detailed instructions, to carry out both simple and detailed instructions, to interact appropriately with the general public, to ask simple questions or request assistance, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to be aware of normal hazards and take appropriate precautions, or to travel to unfamiliar places or use public

transportation; and that Plaintiff was "mildly" limited in his ability to maintain attention and concentration for extended periods, and to set realistic goals or make plans independently. (*Id.* at 786-88.)[21]

### 4.     Reports of Consultative Examiners

The Record also contains medical reports from three consultative examiners: neurologist Dr. Kautilya Puri, who examined Plaintiff on March 20, 2013 (*id.* at 716-19); neurosurgeon Dr. Walter J. Levy, who examined Plaintiff at the behest of the Workers' Compensation Board of New York, on April 16 (*id.* at 836-44) and September 24, 2013 (*id.* at 848-57); and orthopedist Dr. Louis D. Nunez, who saw Plaintiff on November 19, 2013 (*id.* at 827-30), also in connection with his New York State disability retirement application.[22]

### a.     Dr. Kautilya Puri (Consulting Neurologist)

On examination of Plaintiff on March 20, 2013, Dr. Puri found that his gait was normal; that he could stand on heels and toes, although Plaintiff said that he could not walk on them; that his squat was "moderately halfway decreased"; that his stance was normal; that he used a cane for "pain and weightbearing," although Dr. Puri "[did] not feel it [was] necessary"; that he needed no help rising for the exam or getting on and off the exam table; and that he was able to rise from a chair without difficulty. (*Id.* at 717.) Dr. Puri noted that Plaintiff's cervical spine showed generalized decreased range of motion of five to 10 degrees to all modalities, and mild local tenderness. (*Id.* at 718.) Plaintiff was found to have no scoliosis, kyphosis, or abnormality

---

[21] Bachenheimer also indicated that, on the available evidence, he could not evaluate Plaintiff's limitations in 10 other specified areas. (*Id*. at 786-87.)

[22] Medical records in the possession of the Office of the New York State Comptroller were provided to the ALJ on May 16, 2014 in response to a subpoena. (R. at 826 (letter to ALJ Gonzalez from Patricia Suter, Esq., enclosing medical documents "maintained in the file of [Plaintiff]").)

in the thoracic spine.  (*Id.*)  His lumbar spine was found to show generalized decreased range of motion of five to 10 degrees to all modalities; mild local tenderness; and a straight-leg raise test was negative bilaterally.  (*Id.*)  Dr. Puri reported that Plaintiff had full range of motion in his shoulders, elbows, forearms, and wrists bilaterally (*id.*), and that he also had full bilateral range of motion in the hips, knees, and ankles, except for the right hip, which showed generalized decreased range of motion of five to 10 degrees to all modalities, and mild local tenderness (*id.*). Dr. Puri further found that there was no evidence of subluxations, contractures, ankyloses, or thickening; that Plaintiff's joints were stable and nontender, except for both knees and shoulders; and that there was no redness, heat, swelling, or effusion.  (*Id.*)  Dr. Puri diagnosed multiple joint pains secondary to degenerative joint disease status post surgery, with a fair prognosis, and gave the following medical source statement:

> [Plaintiff] did not have any objective limitation to communication, fine motor, or gross motor activities.  There were no objective limitations to [Plaintiff's] gait or to the activities of daily living on examination today.  There were mild limitations to squatting and overhead reaching.  It is recommended that he not lift heavy weights and be seen by an orthopedic doctor.

(*Id.* at 719.)

### b.     <u>Dr. Walter J. Levy (Consulting Neurosurgeon)</u>

On April 16, 2013, New York State Workers' Compensation Board examiner Dr. Levy diagnosed Plaintiff with lumbar radiculopathy, lumbar degenerative spine disease, right lower thoracic strain, and right knee and hip pain.  (*Id.* at 836.)  On physical examination, Dr. Levy noted that Plaintiff's gait was "cautious without specific abnormality"; that there was a positive

Babinski sign;[23] that examination showed mild lumbar local spasm and tenderness by lateral hand palpation; and that Plaintiff had no scoliosis and normal lordosis. (*Id.* at 839.) Dr. Levy also found that Plaintiff had lumbar flexion to 30 degrees (normal 60 degrees) and extension to 15 degrees (normal 25 degrees), and lateral left and right rotation to 15 degrees (normal 30 degrees); with cervical movement to 15 degrees in left and right rotation (normal 80 degrees), 10 degrees flexion (normal 45 degrees), and 10 degrees extension (normal 45 degrees). (*Id.* at 839-40.) Plaintiff's straight-leg raising test was found to be negative, with back pulling at elevation of 60 degrees. (*Id.* at 840.) Dr. Levy gave Plaintiff a cautious prognosis, and opined that Plaintiff showed a "marked partial temporary disability" based on the New York State Workman's Compensation Guidelines. (*Id.* at 842.) Dr. Levy stated that Plaintiff "should currently be able to do light duty work, with a 10 [pound] lifting limit, avoiding frequent turning, lifting and bending, and avoiding lifting above shoulder level." (*Id.* at 843.)

At a second consultative examination on September 24, 2013, also in connection with Plaintiff's New York State workers' compensation benefits application, Dr. Levy diagnosed Plaintiff with lumbar radiculopathy, lumbar degenerative spine disease, status post lumbar surgery of May 20, 2013, right lower thoracic strain, right knee pain, right hip pain, status post surgery of November 2012, and diarrhea. (*Id.* at 848.) On physical examination, Dr. Levy again observed that Plaintiff's gait was "cautious without specific abnormality." (*Id*. at 853.) On this examination, Dr. Levy further found no Babinski sign; mild lumbar local spasm; mild to moderate tenderness in the thoracic and sacral spine; no scoliosis; normal lordosis; lumbar flexion to 30 degrees (normal 60 degrees); lumbar extension to 15 degrees (normal 25 degrees);

---

[23] "When the Babinski reflex is present in . . . an adult, it is often a sign of a central nervous system disorder," including spinal cord injury, defect, or tumor. *Babinski Reflex*, https://medlineplus.gov/ency/article/003294.htm.

lateral bending to the right and left to 15 degrees (normal 25 degrees); lateral left and right

rotation to 15 degrees (normal 30 degrees); cervical movement to 35 degrees in right and left

rotation (normal 80 degrees); cervical flexion to 20 degrees (normal 45 degrees); and cervical

extension to 30 degrees (normal 45 degrees); and no evidence of cervical radiculopathy.  (*Id.* at

853-54.)  He again gave Plaintiff a cautious prognosis and opined that Plaintiff's lumbar

radiculopathy and thoracic strain were causally related to Plaintiff's workplace injury.  (*Id.* at

855-56.)

### c.      Dr. Louis D. Nunez (Consulting Orthopedist)

On November 19, 2013, Dr. Nunez provided a consultative examination of Plaintiff, also

in connection with his New York State benefits application.  (*Id.* at 827-30.)  With respect to

Plaintiff's thoracolumbar spine, Dr. Nunez found forward flexion of 20 degrees (normal 80

degrees), extension of zero degrees (normal 25 degrees), side bending to the left and right of five

degrees (normal 45 degrees), and axial rotation to the right and left of five degrees (normal 80

degrees).  (*Id.* at 828.)  In the seated position, Plaintiff's right thigh strength was found to be

three out of five, and four out of five on the left; and straight-leg raising was found to cause back

pain at 30 degrees short of full extension on the right, and at 10 degrees short of full extension on

the left.  (*Id.*)  In the supine position, straight-leg raising was found to cause back pain at 30

degrees on the left and at 10 degrees on the right.  (*Id.*)  Dr. Nunez found that Plaintiff could flex

his right hip to 100 degrees, and had internal and external rotation to 15 degrees (45 degrees

normal) and abduction of 30 degrees (45 degrees normal).  (*Id.*)  Dr. Nunez further found that

Plaintiff's right knee had full extension and flexion to around 120 degrees, with slight effusion in

the knee joint, and a positive McMurray's test[24] for both medial and lateral compartments. (*Id.*) Dr. Nunez diagnosed status post injury to the lumbar spine with two lumbar spine surgeries, including fusion from L3 to S1, status post right hip arthroscopy, and torn right medial meniscus with persistent right knee pain, and he opined that "there [was] a permanent impairment present, especially in the lumbar spine, which preclude[d] [Plaintiff] from ever being able to return to work in his capacity as an assistant automotive mechanic." (*Id.* at 830.)

### C. Non-Medical Evidence

#### 1. Plaintiff's Function Report Dated January 27, 2013

Plaintiff detailed his daily activities, abilities, and impairments in a Function Report dated January 27, 2013. (R. at 262-72.) He wrote that he was able to "take care of limited household chores," that he went to medical and physical therapy appointments, that he took his daughter to appointments, that he went to friends' houses, and that he received help with chores and pet care from his daughter, mother, and friends. (*Id.* at 263.) Plaintiff also reported that his pain affected his quality of sleep, and that he had trouble falling asleep. (*Id.*)

With regard to his personal care, Plaintiff wrote that he had "difficulty overall getting dressed"; that he could not "wash below the knee properly due to tightness [and] pain"; that he had "no problem" shaving; that cooking was "sometimes problematic if walking [and] standing in [the] kitchen [became] extended"; that using the toilet presented difficulties because "sitting for periods present[ed] problems getting up [and] numbness"; that "anything involving bending, stre[t]ching, lifting any weight or standing for any period longer than a few minutes present[ed]

---

[24] "McMurray's test is used to determine the presence of a meniscal tear within the knee." *McMurray[']s Test*, https://www.physio-pedia.com/McMurrays_Test.

problems"; and that he sometimes required help putting on socks or pants, or retrieving objects on the floor.  (*Id.* at 263-64.)

As to meals, Plaintiff reported that he made food that could be "prepared quickly," bought takeout, or was brought meals by his mother; that, generally, he prepared food for himself daily, but that he sometimes could not prepare food because of his pain and/or "extreme tightness or tenderness"; and that his "friend, mother, or daughter" all assisted him with meal preparation. (*Id.* at 264-65.)

Regarding house and yard work, Plaintiff wrote that he could not "fully take care of [his] property"; that he used a ride-on lawnmower and did household chores and repairs that "[his] body allow[ed] [him] to do or [he] [got] somebody [to help]"; that he could not lift heavy objects or stand or sit for extended periods of time; and that the yard and housework he could complete was "limited due to pain [and] injuries."  (*Id.* at 265.)

Plaintiff also wrote that he left the house every day, but stayed inside when he could; that he limited walking "as this prove[d] to be painful"; that he was able to go out alone and to drive; that he could shop for himself, but had to "go slow[ly]" and "most times [had] assistance"; and that he had done "all [his] banking by computer since [the] onset of painful injuries."  (*Id.* at 265-66.)  With respect to his physical limitations, Plaintiff indicated that he could not lift "any significant weight"; could not bend without pain; could not stand for more than five to 10 minutes without pain; could not walk long distances; could not sit for longer than 10 to 15 minutes at a time; experienced pain in his hip, back, and knee when climbing stairs; could not kneel without difficulty; could not squat; could not reach without pain; could use his hands without issue; had "no problems" with his vision "other than sensitivity to light due to lens implants"; and used a crutch or cane to ambulate.  (*Id.* at 267-69.)  Regarding his mental

impairments, Plaintiff wrote that he had "trouble focusing due to [his] worrying about [his] future (financially [and] physically)"; had trouble finishing what he started; could follow written and spoken instructions; had no problems getting along with people in positions of authority; had never lost a job because of problems getting along with others; was stressed when his schedule changed; and had trouble remembering things. (*Id.* at 269-70.)

The Function Report also includes a pain questionnaire, on which Plaintiff indicated that he had constant pain in his mid- and low back, neck, right hip, and right knee, which began on August 24, 2011 "and progressed"; that the quality of his pain was "stabbing" and "aching," and "caus[ed] immobility"; that his pain radiated to the right side of his body, and sometimes to the left side of his back; that sitting, standing, stretching, walking, "or any sort of lifting" brought on the pain; that Plaintiff's pain medications (oxycodone,[25] metaxalone,[26] meloxicam,[27] and cyclobenzaprine[28]),[29] which he had taken for four or five years, helped control the pain, but not for long, and caused side effects of fatigue, stomach pain, and diarrhea; and that Plaintiff also took over-the-counter painkillers (Advil, Tylenol, and Motrin) and used heat and ice to treat his pain. (*Id.* at 270-72.)

---

[25] Oxycodone is a narcotic painkiller used to treat moderate to severe pain. *Oxycodone*, https://medlineplus.gov/druginfo/meds/a682132.html.

[26] Metaxalone is a muscle relaxant used to relieve pain caused by muscle injuries. *Metaxalone*, https://medlineplus.gov/druginfo/meds/a682010.html.

[27] Meloxicam is a nonsteroidal anti-inflammatory drug ("NSAID") used to treat pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. *Meloxicam*, https://medlineplus.gov/druginfo/meds/a601242.html.

[28] Cyclobenzaprine is a muscle relaxant used to treat pain caused by muscle injuries. *Cyclobenzaprine*, https://medlineplus.gov/druginfo/meds/a682514.html.

[29] Plaintiff also listed additional medications here (Crestor, for cholesterol; and Levitra, for erectile dysfunction) that are not used to treat or manage pain.

## 2. Hearings Before ALJ Gonzalez

Plaintiff testified before ALJ Gonzalez at two hearings – first, on May 20, 2014 (R. at 67-93), and again on August 1, 2014 with the VE (*id.* at 94-126). Plaintiff was represented by Christopher Smith, Esq., of Binder & Binder, at the initial hearing, and by Gary Gogerty, Esq., of Drake Loeb Heller Kennedy Gogerty Gaba & Rodd, PLLC, at the second. (*See id.* at 190, 224-25.)

Regarding his alleged disabling conditions, Plaintiff testified to his belief that he was "worse off [than] before all the surgeries started." (*Id.* at 78.) He testified that his lumbar pain persisted despite treatment (*id.* at 81); that he had pain and swelling in his back and abdomen, possibly related to his liver (*id.* at 84, 86); that he had vision problems stemming from temporary blindness in one eye that was corrected in 1999, but which left him with vitreous floaters that made reading difficult and a "blurry spot" in his left eye (*id.* at 89, 124); that he felt nauseated when looking at a computer screen (*id.* at 90, 124); that it was difficult for him to read "anything more than a newspaper article" (*id.* at 124); that his hip, while improved after surgery, still "lock[ed]" and caused him pain (*id.* at 90, 108); that his pain "[went] up to a 10" (on a scale of 1 to 10) on an average day (*id.* at 110); and that he took oxycodone to help him fall asleep (*id.* at 112). Plaintiff testified that his side effects from medication included fatigue; "stomach problems," including nausea and heartburn; short attention span; and mental "cloud[iness]." (*Id.* at 108-09, 113.) In attending both hearings, Plaintiff used a cane (*id.* at 88, 106-07), which he told the ALJ he used 70 percent of the time (*id.*).

With respect to his treatments, Plaintiff testified that he saw his therapist, Bachenheimer, weekly (*id.* at 74), that trigger point injections administered by Dr. Li "[weren't] working" (*id.* at

85), and that three Synvisc injections and one cortisone injection in his knee "[d]id absolutely nothing for it" (*id.* at 90), but that his pain medication "[took] some of the edge off" (*id.* at 111).

Plaintiff further testified that, since the onset of his disability, he did "nothing, not even taking care of the chores around the house" where he lived with his daughter, who was 17 at the time of the hearings. (*Id.* at 78, 109.) As to his abilities, Plaintiff testified that he was able to sit, stand, or walk for 10 to 15 minutes at a time (*id.* at 79-80); that he regularly had to switch from standing to sitting to minimize his pain (*id.* at 79); that he was able to lift no more than a "light bag of grocer[ies]" (*id.* at 113); that his girlfriend or daughter helped him dress and shop (*id.* at 111); and that he was able to bathe himself, but sometimes received help from his girlfriend (*id.*).

In testifying regarding his work history, Plaintiff explained that he had completed high school and one year of college before starting work as a heavy equipment mechanic, a job that he then held for 17 or 18 years. (*Id.* at 102, 105, 114.) His work had involved the maintenance and repair of municipal machines, such as garbage trucks, loaders, and backhoes. (*Id.* at 105.) Plaintiff testified that he retired due to disability in 2012 and received a New York State disability pension of $1,545 weekly. (*Id.* at 80-82.) The VE classified Plaintiff's past work as a skilled position requiring medium exertion, per the Dictionary of Occupational Titles ("DOT") Listing 620.261-022. (*Id.* at 116.)

The ALJ posed two hypothetical questions to the VE. First, the ALJ asked the VE to assume a candidate with Plaintiff's age, education, and work history, with the RFC to engage in the full range of sedentary work, with the following limitations: the person could understand, remember, and carry out simple, routine, repetitive[30] work; could adapt to routine workplace

---

[30] Transcribed as "competitive" in what this Court assumes to be error.

changes; could occasionally stoop and crouch; could frequently flex, extend, and rotate the neck; could occasionally reach overhead with the bilateral upper extremities; could occasionally push and pull bilaterally; could occasionally climb and descend stairs; must avoid operating motor vehicles and unprotected heights; needed a sit/stand option at will; and must use a cane to ambulate. (*Id.* at 116-17.) The VE testified that "[b]ecause of exertional as well as skill level," such an individual could not perform Plaintiff's past work, but could perform unskilled, sedentary jobs such as a bench assembler, lens inserter, order clerk, and surveillance system monitor. (*Id.* at 117-18.) In response to questioning from Plaintiff's attorney, the VE acknowledged that, while these jobs would accommodate an individual limited to lifting no more than five pounds, they would not accommodate a worker's need to take a break for 10 to 15 minutes every hour, which would amount to being off-task for more than 10 percent of the workday. (*Id.* at 119-20.)

The ALJ's second hypothetical question was the same as the first, but also assumed that the individual would be off-task for 20 percent of the workday. (*Id.* at 118.) The VE stated that anyone who would be off-task for 10 percent or more of the workday would be precluded from employment in any of the four positions he identified, as well as "99 [percent] of the remaining occupations in the competitive workforce." (*Id.* at 118-19.)

### D.  **Procedural History**

In accordance with the Revised Scheduling Order of Magistrate Judge Katharine H. Parker (Dkt. 15), to whom this case was initially referred, the parties to this action filed the Joint Stipulation on October 19, 2017, in which Plaintiff set out the disputed issues and Defendant provided her responses thereto. Plaintiff seeks reversal of the ALJ's decision, or, alternatively, remand to the ALJ for further administrative proceedings, arguing that the ALJ (1) failed to

follow the "treating physician rule" in weighing the opinion evidence provided by Drs. Das and Cabisudo; (2) failed to develop the record with respect to the opinion evidence of Marks; (3) erred in assessing Plaintiff's credibility; and (4) erred in assessing Plaintiff's RFC, including by relying on "flawed" VE testimony. (*See* Joint Stip., at 5, 22-23, 33-39.)  Defendant argues in response that the ALJ "properly discounted" four of Dr. Das's medical opinions and did not, as Plaintiff suggests, improperly substitute his lay opinion for that of Dr. Cabisudo (*id.*, at 12); that the ALJ was not required to give Marks' opinion additional weight, as she was not an acceptable medical source (*id.*, at 24); that the ALJ adequately took into consideration the medical and testimonial evidence of Plaintiff's impairments when assessing his credibility (*id.*, at 30-32); and that the ALJ reached an appropriate determination of Plaintiff's RFC by relying on the Record and useful hypotheticals posed to the VE (*id.*, at 35-38).  Each of Plaintiff's contentions will be discussed in turn below.

## DISCUSSION

## I.    STANDARD OF REVIEW

### A.    Review of ALJ's Decision

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id.* (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131

(2d Cir. 2000). "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)). Thus, the first step is to ensure that the Commissioner applied the correct legal standards. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence. *See Tejada*, 167 F.3d at 773. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). In making this determination, a court must consider the underlying record. The reviewing court does not, however, decide *de novo* whether a claimant is disabled. *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997). Thus, if the correct legal principles have been applied, this Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

**B.**     <u>**The Five-Step Sequential Evaluation**</u>

To be entitled to disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). An individual is considered to be under a disability only if the individual's physical or mental impairments are of such severity that he or she is not only unable to do his or her previous work, but also cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits. *See* 20 C.F.R. § 404.1520; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). Throughout the inquiry, the ALJ must consider four primary sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities. *Id.* §§ 404.1520(a)(4)(ii), 404.1520(c). If the claimant does suffer from such an

impairment, then the third step requires the ALJ to determine whether this impairment meets or

equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.* § 404.1520(a)(4)(iii). If it

does, then the claimant is presumed to be disabled "without considering [the claimant's] age,

education, and work experience." *Id.*

Where the plaintiff alleges a mental impairment, steps two and three require the ALJ to

apply a "special technique," outlined in 20 C.F.R. § 404.1520a, to determine the severity of the

claimant's impairment at step two, and to determine whether the impairment satisfies Social

Security regulations at step three.[31] *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If

the claimant is found to have a "medically determinable mental impairment," the ALJ must

"specify the symptoms, signs, and laboratory findings that substantiate the presence of the

impairment(s)," then "rate the degree of functional limitation resulting from the impairment(s) in

accordance with paragraph (c) of [Section 404.1520a]," which specifies four broad functional

areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace;

and (4) episodes of decompensation.[32] 20 C.F.R. § 404.1520a(b)(2), (c)(3); *see Kohler*, 546 F.3d

at 265. The functional limitations for these first three areas are rated on a five-point scale of

"[n]one, mild, moderate, marked, [or] extreme," and the limitation in the fourth area (episodes of

---

[31] Pursuant to 81 Fed. Reg. 66138-01 (S.S.A. Sept. 26, 2016), the SSA revised the criteria in the Listing of Impairments (the "Listing," 20 C.F.R. Pt. 404, Subpt. P, App'x 1) used to evaluate claims involving mental disorders under Title II of the Act, effective January 17, 2017. These revisions impacted various relevant portions of 20 C.F.R. § 404. This Court will review the ALJ's decision under the text of the applicable regulations as it existed at the time that the ALJ issued his decision, *see Brothers v. Colvin*, No. 7:16cv100 (MAD), 2017 WL 530525, at *4 n.2 (N.D.N.Y. Feb. 9, 2017).

[32] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler*, 546 F.3d at 266 n.5).

decompensation) is rated on a four-point scale of "[n]one," "one or two," "three," or "four or more." 20 C.F.R. § 404.1520a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the record, the claimant's RFC, or ability to perform physical and mental work activities on a sustained basis. *Id.* § 404.1545. The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work." *Id.* § 404.1520(a)(4)(iv). Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light of the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy. *Id.* §§ 404.1520(a)(4)(v), 404.1520(g).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim. *See Berry*, 675 F.2d at 467 (citation omitted). At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984). The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors. 20 C.F.R. § 404.1560(c)(2). Where the claimant suffers from exertional impairments only, the Commissioner can satisfy this burden by referring to the Medical-Vocational Guidelines, set out in 20 C.F.R. Pt. 404, Subpt. P, App. 2 (the "Grids"). Where, however, the claimant suffers from non-exertional impairments (such as postural impairments) that "'significantly limit the range of work permitted by his [or her] exertional

limitations,'" the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (citations omitted)). "A non[-]exertional impairment 'significantly limit[s]' a claimant's range of work when it causes an 'additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity.'" *Id.* at 410-11 (quoting *Bapp*, 802 F.2d at 605-06).

## C.   Duty to Develop the Record

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel.'" *Id.* at 79 (quoting *Perez*, 77 F.3d at 47). The SSA regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports. . . . 'Every reasonable effort' means that we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow-up request to obtain the medical evidence necessary to make a determination.

20 C.F.R. §§ 404.1512(d), (d)(1). The regulations further explain that a claimant's "complete medical history" means the records of his or her "medical source(s)." *Id.* § 404.1512(d)(2). If

the information obtained from medical sources is insufficient to make a disability determination, or if the ALJ is unable to seek clarification from treating sources, the regulations also provide that the ALJ should ask the claimant to attend one or more consultative evaluations.  20 C.F.R. §§ 404.1512(e), 404.1517.

Where there are no "obvious gaps" in the record and where the ALJ already "possesses a complete medical history," the ALJ is "under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa*, 168 F.3d at 79 n.5.

### D.    The Treating Physician Rule

The medical opinion of a treating source as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  "[T]reating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him or her.  20 C.F.R. § 404.1502.[33]  Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. § 404.1527(c)(2); *see Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).

---

[33] A medical source who has treated or evaluated the claimant "only a few times" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)."  20 C.F.R. § 404.1502.

Where an ALJ determines that a treating physician's opinion is not entitled to "controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion. 20 C.F.R. § 404.1502.  Failure to "give good reasons" is grounds for remand.  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of a treating physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS), 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing, *inter alia*, 20 C.F.R. § 404.1527(d)(2)[34]), including:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including whether the treatment received was particular to the claimant's impairment; (3) the supportability of the physician's opinion; (4) the consistency of the physician's opinion with the record as a whole; and (5) the specialization of the physician providing the opinion, 20 C.F.R. § 404.1527(c)(2)-(5); *see Shaw*, 221 F.3d at 134 (noting that these five factors "must be considered when the treating physician's opinion is not given controlling weight"); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 507 (S.D.N.Y. 2014) (requiring an ALJ to "explicitly consider" the factors in order to "override the opinion of a treating physician" (citing *Selian*, 708 F.3d at 418)).

Even where a treating physician's opinion is not entitled to "controlling weight," it is generally entitled to "more weight" than the opinions of non-treating and non-examining sources.  20 C.F.R. § 404.1527(c)(2); *see* Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4 (S.S.A. July 2, 1996) ("In many cases, a treating source's medical opinion will be

---

[34] On February 23, 2012, the Commissioner amended 20 C.F.R. § 404.1527, by, among other things, removing paragraph (c), and re-designating paragraphs (d) through (f) as paragraphs (c) through (e).

entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000). A consultative physician's opinion, by contrast, is generally entitled to "limited weight." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (citations omitted). This is because consultative examinations "'are often brief, are generally performed without benefit or review of the claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons.'" *Id.* (quoting *Torres v. Bowen*, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988)).

### E.    <u>Assessment of a Claimant's Credibility</u>

Assessment of a claimant's credibility with respect to subjective complaints about his or her symptoms or the effect of those symptoms on the claimant's ability to work involves a two-step process. Where a claimant complains that certain symptoms limit his or her capacity to work, the ALJ is required, first, to determine whether the claimant suffers from a "medically determinable impairment[] that could reasonably be expected to produce" the symptoms alleged. 20 C.F.R. § 404.1529(c)(1). Assuming the ALJ finds such an impairment, then the ALJ must take the second step of evaluating the intensity and persistence of the claimant's symptoms. *Id.*; *see also see also Caffrey v. Astrue*, No. 06cv3982 (KMW) (DF), 2009 WL 1953008, at *5 (S.D.N.Y. July 6, 2009) (opinion and order). In doing so, the ALJ must consider all of the available evidence, and must not "reject statements about the intensity and persistence of pain and other symptoms 'solely because the available objective medical evidence does not substantiate [the claimant's] statements.'" 20 C.F.R. § 404.1529(c)(2); *see also Peña v. Astrue*, No. 07cv11099 (GWG), 2008 WL 5111317, at *10 (S.D.N.Y. Dec. 3, 2008). Instead, where the

claimant's contentions regarding his or her symptoms are not substantiated by the objective medical evidence, the ALJ must consider the other evidence and make a finding as to the claimant's credibility, in order to determine the extent to which the claimant's symptoms affect his or her ability to do basic work activities. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); SSR 96-7p (S.S.A. July 2, 1996);[35] *Bush v. Shalala*, 94 F.3d 40, 46 n.4 (2d Cir. 1996).

While an ALJ "is required to take [a] claimant's reports of pain and other limitations into account" in making a credibility determination, he or she is "not required to accept the claimant's subjective complaints without question." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). "Rather, the ALJ may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id*. The ALJ must, however, include "specific reasons for [his or her] finding on credibility, supported by the evidence in the case record," and the reasons must make it sufficiently clear for a reviewer to determine "the weight the [ALJ] gave to the [claimant's] statements and the reasons for that weight." *See* SSR 96-7p. The factors that an ALJ should consider in evaluating the claimant's credibility are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications

---

[35] As of March 28, 2016, SSR 16-3p superseded SSR 96-7p. *See* SSR 16-3p, 2016 WL 1237954 (S.S.A. Mar. 28, 2016). The new ruling eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." *Id*. at *1. Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms." *Id*. at *2. Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings. *Compare* SSR 96-7p *with* SSR 16-3p. As the ALJ's decision in this matter was issued before the new regulation went into effect, this Court will review the ALJ's credibility assessment under the earlier regulation, SSR 96-7p.

taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

## II.     THE ALJ'S DECISION

The decision at issue is the ALJ's determination, made on June 19, 2015, that Plaintiff had not been disabled since his claimed onset date of May 26, 2012. (*See generally* R. at 25-53.) The ALJ's lengthy decision, in which he applied the five-step sequential evaluation procedure, is summarized below.

### A.     Sequential Evaluation, Steps One Through Three

At Step One, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since May 26, 2012, the alleged onset date of his disability. (*Id.* at 30.)

At Step Two, the ALJ found that Plaintiff had the following severe impairments:  right knee chondromalacia of the patella, osteoarthritis of the right knee and right hip, status post cervical and lumbar spine surgeries, degenerative disc disease of the lumbar spine, status post right hip arthroscopy, obesity, gastritis, anxiety, and depression. (*Id.* at 31.)  At Step Three, the ALJ determined that Plaintiff's combined physical impairments did not meet or medically equal the severity of the listed impairments in Appendix 1 that the ALJ considered – specifically, 1.02 (dysfunction of a joint), 1.04 (disorders of the spine), and 1.07 (upper extremity fracture). (*Id.* at 32-33.)  The ALJ noted that obesity alone may be medically equivalent to a listed impairment (citing SSR 02-1p) and that an individual may also meet the requirements of a listing if his or her impairment(s), when considered in combination with obesity, meet(s) a listing. (*Id.* at 32-33.) The ALJ found, however, that, "[w]hile obesity affected [Plaintiff's] spine and joint

impairments, there was insufficient evidence to show that it raised them to listing-level severity."
(*Id.* at 33.)  In addition, the ALJ found that Plaintiff's mental impairments did not meet or
medically equal the criteria of Listings 12.04 (depressive, bipolar, and related disorders) or 12.06
(anxiety and obsessive-compulsive disorders).  (*Id.* at 33-34.)

The ALJ found that Plaintiff had mild restrictions in activities of daily living.  (*Id.* at 33.)
He noted that Plaintiff was able to perform light chores, take care of his daughter and pets,
manage his own personal care with "certain adjustments," cook light meals, perform yard work
and repairs, and go shopping, walk, and drive "when necessary."  (*Id.*)

As to social functioning, the ALJ found that Plaintiff had mild difficulties.  (*Id.*)  The
ALJ noted that Plaintiff had no reported issues or limitations in "getting along with people or
authority figures"; that Plaintiff could drive, socialize, get along with his family, use the phone,
visit friends and family, travel independently, shop in stores, and, again, that Plaintiff was able to
care for his daughter.  (*Id.*)  The ALJ cited Dr. Li's February 28, 2011 report indicating
Plaintiff's "good use" of language, normal appearance, normal behavior, and normal mood (*see
id.* at 703), and Dr. Cabisudo's impression that Plaintiff was "consistently cooperative with
normal behavior and good impulse control," as supporting "only mild limitation" in this area (*see
id.* at 723-41).  (*Id.* at 33.)

As to concentration, persistence, or pace, the ALJ found that Plaintiff had moderate
difficulties.  (*Id.*)  In this regard, the ALJ remarked that Bachenheimer had "noted persistent
symptoms of anxiousness and depressive mood, disrupting [Plaintiff's] mental functioning" (*id.*
(citing *id.* at 1474-83)), and that Dr. Cabisudo had assessed Plaintiff's judgment and insight as
"fair" (*id.* (citing *id.* at 723-41)).  The ALJ found, however, that Plaintiff "[was] able to
concentrate sufficiently to help his daughter with her homework and manage money" (*id.* (citing

*id.* at 262-72)), that, according to Dr. Cabisudo, Plaintiff "was consistently alert and oriented, and . . . displayed logical thought processes with no abnormal perceptual disturbances" (*id.* (citing *id.* at 723-41)), and that, according to Dr. Levy, Plaintiff's attention span and concentration "did not appear compromised" and he "demonstrated intact orientation and memory" (*id.* (citing *id.* at 840)). The ALJ determined that Plaintiff had experienced no episodes of decompensation of extended duration. (*Id.*)

### B.     The ALJ's Assessment of Plaintiff's RFC

The ALJ found that Plaintiff's RFC permitted him to perform sedentary work, as defined at 20 C.F.R. § 404.1567(a), with the following limitations:  he could understand, remember, and carry out only simple, routine, and repetitive work; adapt to workplace changes; occasionally stoop and crouch; frequently flex, extend, and rotate his neck; occasionally reach overhead, push, and pull with the bilateral upper extremities; and occasionally climb and descend stairs; and he needed to avoid operating a motor vehicle and unprotected heights, to be allowed to sit or stand at will, and to use a cane to ambulate. (*Id.* at 34.)

With respect to Plaintiff's credibility, the ALJ found that Plaintiff's medically determinable impairments could be expected to cause his alleged symptoms,[36] but that his statements concerning their intensity, persistence, and limiting effects were "not entirely

---

[36] Plaintiff's alleged symptoms, as summarized by the ALJ, included a limited ability to lift, bend, stand for more than 10 minutes, walk for long distances, sit for more than 15 minutes, climb stairs, kneel, squat, reach, push, pull, and walk more than 100 feet; constant pain in his neck, back, and lower extremities radiating to his right side, exacerbated by all physical activity; side effects of fatigue, stomach pain, and diarrhea from pain medication; necessary use of a cane or crutches; inability to focus and remember instructions; marked limitations in remembering locations and procedures, interacting appropriately with the public and coworkers, maintaining appropriate behavior and standards, traveling, setting realistic independent goals; and moderate limitations in carrying out unskilled work, maintaining attention for extended periods, adhering to a schedule, working with others, making simple decisions, and responding to changes and hazards. (R. at 35 (citing *id.* at 261-80, 317, 352-54).)

credible." (*Id.* at 35.) The ALJ further found that Plaintiff had made "inconsistent statements regarding his ability to return to work," which "erode[d] [his] credibility" (*id.* at 39), citing a few statements, attributed to Plaintiff, which the ALJ described as follows: in June 2012, following his first surgery, Plaintiff "admitted to Mr. Sullivan that he did not return to work because 'modified or light duty work [was] not available for his position'" (*id.* (quoting *id.* at 883)); in August 2012, Plaintiff "admitted that he was able to sit for many hours" (*id.* (citing *id.* at 906)); and "[i]n his sessions with Bachenheimer, [Plaintiff] periodically report[ed] improvement in his pain" (*id.* (citing *id.* at 1476)).

### 1.    The ALJ's Assessment of Plaintiff's Physical Impairments (Spine, Knee, and Hip)[37]

As to Plaintiff's spinal impairment, the ALJ found that "[t]he medical images of [Plaintiff's] spine show[ed] the progress of [Plaintiff's] impairments but also show[ed] improvement after each surgery." (*Id.* at 36.) As of Plaintiff's second spinal surgery on May 30, 2013, according to the ALJ, "medical images showed no 'complicating features' and satisfactory alignment with severe persistent lumbar degeneration." (*Id.* (citing *id.* at 817-22, 827, 1111-16).) The ALJ noted that Plaintiff's June 2014 spinal MRIs "showed a normal thoracic spine and disc degeneration of the cervical spine, causing 'some compression'" (*id.* (citing *id.* at 1473)), and that "[c]linical signs and objective findings . . . consistently included reduced range of motion

---

[37] Although not principally at issue here, the ALJ also discussed certain evidence regarding Plaintiff's digestive complaints. In determining that Plaintiff's "pain, nausea, and other symptoms connected to [gastritis] [were] not as functionally limiting as alleged" (*id.* at 36), the ALJ relied on what he described as: lab tests showing only "mild, inactive chronic gastritis" in the stomach antrum and "moderate chronic gastritis" in the gastro-esophageal junction (*id.* (citing *id.* at 1403)); "consistently normal" abdominal exams (*id.* (citing *id.* at 1364, 1376)); improvement, by April 25, 2013, in Plaintiff's pain, with a high-fiber diet and medication, which was "adjusted periodically" to alleviate "mild recurring symptoms" (*id.* at 35-36 (citing *id.* at 1178, 1190, 1205, 1230, 1240-44, 1258-60, 1279, 1308, 1328)); and the benign character of 11 polyps, which were removed (*id.* at 36 (citing *id.* at 1156, 1203)).

and tenderness, but not to the degree[] [Plaintiff] allege[d]" (*id.* (citing *id.* at 559, 718, 745, 828, 1328).)  The ALJ also cited Dr. Levy's April 16, 2013 independent medical exam, in which Dr. Levy "acknowledged [Plaintiff's] 'mild' lumbar spasm, spinal tenderness, and reduced range of motion in the spine," but made other negative or normal clinical findings upon testing Plaintiff.  (*Id.* at 37 (citing *id.* at 838-42, 853-55).)  The ALJ determined that Plaintiff underwent "[s]uccessful surgeries without medically documented complications[,] suggest[ing] improvement with treatment."  (*Id.* at 36.)  He concluded further that "there were no clinical signs of such severity as to suggest that [Plaintiff] could not perform regular and continuing sedentary work with the option to sit or stand at will during the affected period," and that the caveats noted by the ALJ with respect to Plaintiff's RFC would "accommodate [Plaintiff's] observed functional deficiencies."  (*Id.*)

Regarding Plaintiff's right knee and right hip, the ALJ noted that Plaintiff's X-rays and MRIs "show[ed] the prior state of the impairments but g[a]ve no insight into [Plaintiff's] [then-]present condition."  (*Id.* (citing *id.* at 676, 714, 773, 1132).)  The ALJ also summarized the medical evidence of Plaintiff's right hip surgery in 2012 and post-surgery "improve[ment]" through December 2013, when Dr. Nunez "noted deficits in range of motion of the right hip, with some reduced strength in the right leg."  (*Id.* at 37 (citing *id.* at 587, 676, 703, 717-18, 828, 1121).)  Summarizing medical evidence of Plaintiff's knee pain that did not respond to treatment between April 2013 and June 2014, when Plaintiff underwent a right knee arthroscopy, the ALJ concluded that, while "[n]o physical exams or medical images were submitted following the right knee surgery, . . . there was also no evidence that the surgery failed."  (*Id.* at 38.)  The ALJ concluded that "[Plaintiff's] abilities most likely improved with treatment."  (*Id.* (citing *id.* at 1121, 1126, 1132, 1133).)  The ALJ stated that physical exams conducted in March 2014, and on

April 25 and May 22, 2014, showing mild gait abnormalities, negative clinical signs, and otherwise "normal" clinical results, "reflect[ed] that [Plaintiff's] limitations, even at the height of his joint pain, were not as severe as alleged."  (*Id.* (citing *id.* at 563-656, 1142-43, 1166, 1169, 1199[38]).)  The ALJ concluded that "[t]he clinical signs of tenderness and reduced range of motion [were] not so severe that [Plaintiff] could not perform regular and continuing sedentary work with the option to sit or stand at will," and that the ALJ's assessment of Plaintiff's RFC "accommodate[d]" Plaintiff's "functional deficiencies" with respect to Plaintiff's need for occasional postural changes; only occasional stair-climbing, reaching, pushing, and pulling; no more than frequent turning of the neck; and the use of a cane; and his need to avoid driving or working at unprotected heights.  (*Id.* at 37-38.)

The ALJ also found that Plaintiff's overall "treatment history [did] not support the alleged extent of his limitations and show[ed] gradual improvement."  (*Id.* at 38.)  The ALJ noted that, on July 30, 2008, following spinal surgery, Dr. Das had advised Plaintiff to seek work that did not require heavy lifting, but that Plaintiff instead "returned to his prior job."  (*Id.* (citing *id.* at 802-25).)  The ALJ also cited Dr. Li's report that Plaintiff's May 2012 surgery "'significantly improved'" his right-side muscle spasm, and that four steroid injections provided "'instant pain relief,'" except for Plaintiff's lower back.  (*Id.* (quoting *id.* at 703-04).)  Regarding Plaintiff's pain management treatment at Crystal Run from May 26, 2012 through July 22, 2014, the ALJ cited Plaintiff's healthcare providers' normal or negative clinical findings (*id.* at 38-39 (citing *id.* at 1142, 1213, 1249)), and Plaintiff's improvement with physical therapy two or three

---

[38] Throughout his decision, the ALJ cited to both 30F/61-65 (R. at 1196-1200) and 38F/1-4 (*id.* at 1543-47), which are duplicates of Dr. Booker's March 24, 2014 report.  This Report and Recommendation will refer to the version of the report in question included in the Record at 1196-1200.

times a week (*id.* at 39 (citing *id.* at 1104, 1106, 1486, 1497-1510, 1527)). The ALJ concluded

that Plaintiff's "treatment providers never observed the degree of functional limitation that

[Plaintiff] allege[d] and, in fact, reported improvement in his condition." (*Id.*) The ALJ further

concluded that, "considering [Plaintiff's] performance on physical exams . . .[,] [his] many and

varied treatments appeared to maintain and improve his functional capacity, rendering hi[m]

capable of performing some work." (*Id.*)

       The ALJ also reviewed and weighed medical opinion evidence regarding Plaintiff's

physical functioning, beginning with evidence from Dr. Das, whom the ALJ described as a

"long-term treating source." (*Id.* at 41.) While the ALJ included in his analysis a summary of

Dr. Das's December 11, 2012 spinal impairment questionnaire (*see id.* at 776-82), February 26,

2013 narrative report (*see id.* at 701-02), December 4, 2013 letter (*see id.* at 742), and May 14,

2014 multiple impairment questionnaire (*see id.* at 793-800, 40-41), he gave them "little weight"

(*id.* at 41), according "controlling weight" (*id.*) only to the final opinion that Dr. Das provided on

July 27, 2014 (*see id.* at 1134-35), in response to the ALJ's request for clarification. According

to the ALJ, while Dr. Das's four preceding reports contained "recommendations [that] varied

widely[,] as the opinions were submitted at different points in [Plaintiff's] surgical history,"

Dr. Das's July 27, 2014 letter, in which he stated that Plaintiff was capable of a range of

sedentary work, but precluded from returning to his previous work as a mechanic, "comport[ed]

with [other] post-surgical medical images [and] clinical signs, and with the opinions of Dr. Levy

and Dr. Li." (*Id.* at 41.)

       With respect to the opinion evidence from Plaintiff's other treaters, the ALJ gave "slight

weight" to the medical evidence from Dr. Lazzarini, "as it [was] not a function-by-function

assessment of work activity." (*Id.*) The ALJ specifically referred to (1) a progress note by

Dr. Lazzarini, dated January 30, 2013, in which, as described by the ALJ, the doctor "briefly stated . . . that [Plaintiff] [was] 100% disabled" (*id.* (citing *id.* at 1120)), (2) Dr. Lazzarini's "later notes" describing Plaintiff's knee pain, which reportedly made it difficult for Plaintiff to climb stairs and sit for prolonged periods of time (*id.* (citing *id.* at 1121, 1132)); and (3) "[f]urther reports" that purportedly "showed that, a year after surgery, [Plaintiff] was doing significantly better" (*id.* (citing *id.* at 1121)).

The ALJ accorded "some weight" to the February 28, 2013 spinal impairment questionnaire completed by Dr. Li (*see id.* at 744-50), whom the ALJ described as "a neurologist who ha[d] treated [Plaintiff] since August of 2012." (*Id.*) The ALJ concluded that Dr. Li's questionnaire was "consistent with the opinions of Dr. Das and Dr. Levy, and [Plaintiff's] spinal exams." (*Id.* (citing *id.* at 838-40, 853-55, 1134, 1199).) The ALJ noted, however, that "the postural limitations" assessed by Dr. Li were "not supported by [Plaintiff's] ability to perform tandem gait, heel walk, and toe walk; or his ability to sit, stand, and get on and off exam tables without assistance." (*Id.* at 41-42 (citing *id.* at 1169, 1199).)

To the March 20, 2013 report by consultative examiner Dr. Puri (*see id.* at 716-19), the ALJ assigned "some weight," finding it "corroborated by the latest opinion of Dr. Das and the opinion of Dr. Levy, images of [Plaintiff's] spine, and [Plaintiff's] performance in clinical exams showing reduced range of motion but otherwise normal functioning." (*Id.* at 42 (citing *id.* at 867-1108 (Move Physical Therapy records), 834-58 (IME reports)).) The ALJ found, however, that Plaintiff's reduced range of motion and pain in his spine "require[d] additional limitations." (*Id.* (citing *id.* at 838-40, 853-55).)

The ALJ gave "great weight" to Marks' opinion that Plaintiff could not return to his past work as a 'heavy equipment mechanic" (*id.*), noting that Marks had recorded, in a treatment note

on April 17, 2014, that Plaintiff was "'functionally disabled'" with respect to such work (*id.* (citing *id.* at 1166)); the ALJ found that opinion to align with "the great weight of the evidence showing reduced spinal range of motion and tenderness" (*id.* (citing *id.* at 838-40, 853-55, 1134, 1199)).

Also assigning "great weight" to Dr. Levy's April 16, 2013 consultative opinion,[39] the ALJ agreed with Dr. Levy's assessment that Plaintiff "should be able to perform 'light duty work' with a ten-pound lifting limit, avoiding frequent turning, carrying, bending, and especially lifting above the shoulder level." (*Id.* (citing *id.* at 843).) The ALJ observed that Dr. Levy's "findings [were] consistent with the findings of treating sources," that "Dr. Das referenced Dr. Levy's findings in issuing his controlling opinion" dated July 27, 2014, and that Dr. Levy's report for the Workers' Compensation Board "was given in functionally relevant terms." (*Id.*)

The ALJ similarly gave "great weight" to Dr. Nunez's report of his independent orthopedic examination dated November 19, 2013 (*id.* at 827-30), which the ALJ received from the Office of the New York State Comptroller in response to a subpoena. The ALJ concluded that, based on "Dr. Nunez's findings of reduced strength and range of motion in the spine and knee [that were] consistent with other clinical findings . . .[,] [t]he medical evidence demonstrate[d] that [Plaintiff] [was] precluded from performing the heavy lifting, standing, and walking of his previous work." (*Id.* at 43 (citing *id.* at 838-40, 853-55, 1134, 1199).)

---

[39] Although the ALJ referred here to a report of Dr. Levy dated October 3, 2013, the substantive opinion he described is actually found in Dr. Levy's report of April 16, 2013 (*see id.* at 836-44), and this Court therefore assumes that the ALJ provided the October 3 date in error. The Record does contain a report dated September 24, 2013 (*id.* at 848-57) and signed by Dr. Levy on October 3, 2013 (*see id.* at 846), based on Dr. Levy's second examination of Plaintiff, for the New York State Workers' Compensation Board, but the ALJ did not indicate what weight, if any, he assigned to the contents of that opinion.

Noting that the Workers' Compensation Board "use[d] a different standard for determining disability than the [SSA]," the ALJ gave "little weight" to New York State's approval of Plaintiff's Article 15 Disability Retirement application. (*Id.* (citing *id.* at 743).)

## 2. **Mental Impairments**

With respect to Plaintiff's mental impairments, the ALJ found that "the clinical signs and objective findings [did] not support the alleged limitations," and that "[Plaintiff's] mild deviations in mood, judgment, and insight [did] not suggest that [he was] incapable of carrying out simple routine tasks and adapting to workplace changes." (*Id.* at 39.) The ALJ found that Plaintiff's "admitted activities, such as traveling independently, caring for his daughter, and managing his own finances[] show[ed] that he [was] capable of at least simple mental tasks with normal workplace changes." (*Id.* at 44.) In support of this finding, the ALJ relied on the following: Dr. Li's February 28, 2013 report that Plaintiff was "alert and oriented with good memory, abstraction, language, and fund of knowledge" (*id.* at 39 (citing *id.* at 703)); Dr. Cabisudo's April 21, 2013 initial mental assessment noting Plaintiff's depression and anxiety, but "otherwise normal appearance and behavior, orientation, and thought process" (*id.* (citing *id.* at 740)); several purportedly "normal mental status exams" recorded by Dr. Cabisudo "throughout . . . 2013 and 2014" (*id.* (citing, generally, *id.* at 723-41, 755-62)); "several normal mental status exams" conducted by Dr. Rahman, multiple reports by Dr. Rahman indicating no complaints of depression or anxiety, and no reports or depression or anxiety made to other Crystal Run treatment providers (*id.* (citing *id.* at 1179, 1214, 1230, 1249, 1258, 1265, 1289, 1308, 1325, 1328, 1549)).

The ALJ determined that Plaintiff's "mental symptoms were derived from situational stressors, and that they were not as severe as alleged." (*Id.* at 40.) He acknowledged that

Plaintiff's treating psychiatrist, Dr. Cabisudo, had "noted no change in [Plaintiff's] anxiety" in 2013 and 2014, and had "consistently" found that, while Plaintiff "was tolerating medications with slight adjustments to dosage," he "was not responding to treatment." (*Id.* (citing *id.* at 735).) The ALJ, though, contrasted Dr. Cabisudo's opinion that Plaintiff's anxiety and depression had "'gotten worse'" because of "medical, financial, and personal stressors" (*id.* (quoting *id.* at 740)) with Plaintiff's Crystal Run records, which, the ALJ observed, "noted no anxiety or depression" (*id.* (citing *id.* at 1142)). The ALJ also found support in the records of Bachenheimer, the social worker with whom Plaintiff began therapy in April 2013, and with whom, according to the ALJ, Plaintiff "did not discuss any mental, psychological, or perceptual disturbances of such a degree that they would prevent him from performing simple mental tasks." (*Id.*) As noted by the ALJ, Bachenheimer "consistently stated that [Plaintiff's] emotional disturbance was due to his physical pain and financial stressors, not to any mental abnormality" (*id.* (citing *id.* at 1474)); he "periodically note[d] emotional improvement or relief from stress" (*id.* (citing *id.* at 1474-75)); and he "never observe[d] any psychological abnormalities or mental defects aside from depressed, anxious, or frustrated mood" (*id.* (citing *id.* at 1474-83)). The ALJ acknowledged that both Dr. Cabisudo and Bachenheimer had given Plaintiff Global Assessment of Functioning ("GAF") scores[40] between 50 and 60, "indicating moderate symptoms or

---

[40] Axis V of the multiaxial system laid out in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV") is the GAF score, representing the clinician's judgment as to an individual's "overall level of functioning." DSM-IV at 32. The scale ranges from 0 to 100. (*Id.*) A GAF score in the 51-60 range signifies "moderate symptoms or moderate difficulty in social, occupational, or school situations." *Petrie v. Astrue,* 412 F. App'x 401, 506 n.2 (2d Cir. 2011) (Summary Order) (citing DSM-IV, at 34). The DSM-V, however, "has dropped the use of the [GAF] scale." *Restuccia v. Colvin,* No. 13cv3294 (RMB), 2014 WL 4739318, at *8 (Sept. 22, 2014) (quoting *Mainella v. Colvin,* No. 13cv2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014)).

occupational limitations," but explained that GAF scores "do not provide a reliable longitudinal measure of a claimant's functionality unless supporting details are present." (*Id.* at 43 (citing *id.* at 723-41, 859-66).)

The ALJ assigned Dr. Cabisudo's opinion evidence regarding Plaintiff's mental limitations "little weight," finding that his records were "inconsistent" and "never noted the degree of depression or anxiety required to render [Plaintiff] totally unable to perform" functions related to memory, attention, concentration, and socializing. (*Id.* at 44; *see also id.* at 43 (discussing *id.* at 859-66, 1542).) In particular, the ALJ again noted what he described as Plaintiff's "normal" mental status exams (except for "fair" judgment and insight), as assessed by Dr. Cabisudo, throughout 2013 and 2014. (*Id.* at 44 (citing *id.* at 723-41, 755-62).) The ALJ also assigned "little weight" to Bachenheimer's May 12, 2014 psychological questionnaire (*id.* at 783-90), on the grounds that it was "vague in prescribing limitations," did not "express[] [stress] in functional terms," was inconsistent with Plaintiff's normal mental status examinations, and was not supported by Plaintiff's activities of daily living. (*Id.* at 44 (citing *id.* at 723-41, 755-62, 1265, 1289, 1308, 1325, 1328).)

### C. <u>Steps Four and Five</u>

The ALJ determined that Plaintiff's RFC did not permit him to perform any past relevant work. (*Id.* at 44-45.) Relying on the Grids, as well as testimony from the VE at Plaintiff's August 1, 2014 hearing, the ALJ concluded that Plaintiff was capable of performing four different unskilled jobs requiring sedentary exertion levels that exist in significant numbers in the national economy: (1) bench assembler (DOT 734.687-018); (2) lens inserter in the optical goods industry (DOT 713.687-026); (3) order clerk in the restaurant industry (DOT 209.567-014); or (4) surveillance system monitor (DOT 379.367-010). (*Id.* at 46.)

Ultimately, the ALJ found that Plaintiff had not been under a disability, as defined in the Act, from May 26, 2012 through the date of his decision. (*Id.*)

## III.  REVIEW OF THE ALJ'S DECISION

### A.  Relevant Review Period

As Plaintiff reported that his disability began on May 26, 2012, the relevant period under review for Plaintiff's SSDI benefits runs from that date through December 31, 2018, the date that Plaintiff will be last insured.  42 U.S.C. §§ 423(a)(1), (c)(1); 20 C.F.R. §§ 404.130, 404.315(a); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989)).[41]  To be eligible for SSDI benefits, Plaintiff must show he had a disabling condition, lasting 12 months or longer, within that period of coverage.  *See Arnone*, 882 F.2d at 37.

### B.  Errors Claimed by Plaintiff

Turning to the questions of whether the ALJ's determination that Plaintiff was not disabled constituted legal error and/or was not supported by substantial evidence, this Court looks to the four specific challenges raised by Plaintiff:  (1) the ALJ's alleged failure to follow the treating physician rule with respect to Drs. Das and Cabisudo; (2) his alleged failure to develop the record with respect to the opinion evidence of Marks; (3) his alleged legal error in assessing Plaintiff's credibility; and (4) the alleged "flaws" in the ALJ's RFC analysis generally,

---

[41] "An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage,'" *i.e.*, quarters in which the applicant earned wages and paid taxes, "to total quarters."  *Arnone*, 882 F.2d at 37-38.  To qualify for SSDI, an applicant must establish that he or she became disabled on or before the expiration of his or her insured status.  *Id.* at 38. Here, it is undisputed that Plaintiff's last date of insured coverage will be December 31, 2018 (R. at 29, 30), although a Field Office Disability Report dated November 16, 2012 indicates that Plaintiff's date last insured was December 31, 2016 (*id.* at 247), which this Court assumes to be error.

and specifically in his reliance on VE testimony. (*See* Joint Stip., at 5.) This Court will address each of these arguments in turn.

### 1. Claimed Failure To Follow the Treating Physician Rule

As to the first of Plaintiff's arguments – that the ALJ failed to comply with the treating physician rule, specifically with respect to the weight he accorded to the opinions of Plaintiff's treating neurosurgeon, Dr. Das, and his treating psychiatrist, Dr. Cabisudo – this Court agrees that the ALJ committed legal error, warranting remand.

### a. Dr. Das

The ALJ assigned "little weight" to four opinions of Dr. Das, completed during the period from December 2012 to May 2014 (*i.e.*, Dr. Das's December 11, 2012 spinal impairment questionnaire (R. at 776-82), his February 26, 2013 report (*id.* at 701-02), his December 4, 2013 letter (*id.* at 742), and his May 14, 2014 multiple impairment questionnaire (*id.* at 793-800)), but then proceeded to assign "controlling weight" to the doctor's July 2014 letter – the only one of his opinions that seemed to suggest, in any way, that Plaintiff was capable of working. According to Plaintiff, the ALJ's refusal to accord greater weight to the first four of Dr. Das's opinions, combined with his purported failure to give good reasons for discounting those opinions, was an impermissible divergence from the treating physician rule that was not remedied by the ALJ's acceptance of Dr. Das's last letter. Plaintiff suggests that the ALJ's assertion that Dr. Das's earlier opinions "varied widely" (*id.* at 41) represented an unfair and unreasonable reading of those opinions, which, according to Plaintiff, did not actually reveal any meaningful variation, other than that which could be explained by the "progression over time" of Plaintiff's conditions (*see* Joint Stip., at 21). In large measure, this Court agrees that the ALJ erred in substantially discounting most of the opinion evidence provided by Dr. Das.

Certainly, Dr. Das should have been considered a "treating physician" for purposes of the "treating physician rule," as he had a significant treatment relationship with Plaintiff. The Record reflects that Plaintiff made at least 20 visits to Dr. Das between June 2008 and July 2014 and that Dr. Das performed each of Plaintiff's three complex spinal surgeries. As a general matter, this type of "longitudinal" treatment relationship would justify giving controlling weight to Dr. Das's opinions, or at least greater weight than that accorded to those of consulting physicians.[42] 20 C.F.R. § 404.1527(d)(2); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). Dr. Das also had relevant expertise, as the ALJ himself acknowledged: "Dr. Das [was] a board certified neurosurgeon with a fellowship in spinal surgery and ha[d] been practicing for [14] years," as of the date of the ALJ's decision. (R. at 41.)

Defendant contends that there was no error in the ALJ's decision to discount Dr. Das's first four opinions because (according to Defendant) those opinions were inconsistent with substantial medical evidence in the Record, or were internally inconsistent. (*See* Joint Stip., at 14, 36.) For example, Defendant characterizes Dr. Das's February 2013 letter as stating "that Plaintiff was totally disabled, and then [as] contradictorily stat[ing] that [Plaintiff] had only a 75 [percent] permanent marked disab[ility]." (*Id.*, at 14 (citing R. at 702).) Yet it appears that, fairly read, this aspect of Dr. Das's February 2013 opinion merely distinguished between Plaintiff's functional capabilities, which the doctor described as being diminished by 75 percent, and Plaintiff's capacity to return to work, which the doctor believed to be completely precluded. For another example of supposed inconsistency, Defendant suggests that Dr. Das's December 4,

<hr>

[42] Although Plaintiff saw other treatment providers several times during the relevant time period (for example, Drs. Hoffman, Rahman, and Nici of Crystal Run), such that they, too, may qualify as "treating physicians" for the purposes of the rule, Plaintiff's "treating physician rule" argument is based only on the ALJ's decision to assign "little weight" to the opinions of Drs. Das and Cabisudo.

2013 finding that Plaintiff was "totally disabled from working," was in conflict with his May 14, 2014 opinion, which, as described by Defendant, indicated that Plaintiff "could sit for three hours, stand or walk for up to two hours, should be allowed to switch positions at will, could occasionally lift and carry up to 20 pounds and frequently lift and carry up to five pounds, had moderate reaching limitations, and should not engage in repetitive reaching or lifting." (Joint Stip., at 14 (citing R. at 796-97, 742).) After review of the Record, this Court does not accept Defendant's characterization of either Dr. Das's May 2014 opinion, or of the supposed conflict between that opinion and Dr. Das's December 2013 assertion of disability, especially as Dr. Das's May 2014 opinion actually described a number of postural and non-exertional restrictions that, if factored into the analysis, may well have supported the conclusion that Plaintiff could not work.

First, on the question of Plaintiff's postural limitations, Dr. Das did not clearly opine in May 2014, as Defendant would have it, that Plaintiff could sit for up to three hours at a time, and stand or walk for up to two hours at a time, before needing to switch to a different position in the workplace. Rather, the questionnaire that Dr. Das filled out inquired as to how many hours Plaintiff could "sit" "in an eight-hour [work]day," and how many hours he could "stand/walk" in an eight-hour day. (*See id*. at 795.) By circling "3" for the former and "2" for the latter (*see id*.), it seems that Dr. Das was indicating that Plaintiff could sit or stand/walk for a *total* of only five hours in an eight-hour workday, thereby implying that Plaintiff would need to rest for the remaining three hours. Indeed, Dr. Das further noted that Plaintiff would need to "rest" every one to two hours, for at least 10 to 15 minutes. (*Id.*, at 798.) On this point alone, even the VE testified that a claimant would not be able to perform the sedentary jobs that the VE had

identified, if the claimant needed to take a break for 10 to 15 minutes every hour – a scenario that could well have fallen within the restriction specified by Dr. Das.

Second, as to Plaintiff's non-exertional limitations, Dr. Das indicated in the May 2014 questionnaire that Plaintiff suffered from muscle spasms and "constant" pain, mostly in his mid and low back, which the doctor described as "sharp" and "burning" (R. at 794-95), and that both sitting and standing were precipitating factors leading to Plaintiff's pain (*id.* at 795). Dr. Das further noted that Plaintiff was taking pain medication and muscle relaxants, including OxyContin, oxycodone,[43] Flexeril,[44] and Mobic,[45] and that, as to at least three of these medications, Plaintiff had reported side effects that included fatigue, drowsiness, and/or impaired concentration. (*Id.* at 797.) Dr. Das also stated that Plaintiff was incapable of tolerating "even 'low stress'" in the workplace, given his "pain and continued use of narcotic pain medications to control pain, and [his] need to change position frequently with frequent rest breaks." (*Id.* at 798.) Finally, Dr. Das opined that, as a result of his impairments, Plaintiff would likely be absent from work more than three times a month. (*Id.* at 799.) Taken together, these stated opinions regarding Plaintiff's postural and non-exertional impairments could hardly be considered incompatible with Dr. Das's December 2013 opinion that Plaintiff was "totally disabled from working" (an ultimate opinion reserved, in any event, to the Commissioner, *see Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted)).

---

[43] Although OxyContin is the brand name of the generic narcotic painkiller oxycodone, Dr. Das listed both OxyContin and oxycodone separately on the questionnaire. (R. at 797.)

[44] Flexeril (cyclobenzaprine) is a muscle relaxant. *Cyclobenzaprine*, https://medlineplus.gov/druginfo/meds/a682514.html.

[45] Mobic (meloxicam) is an NSAID. *Meloxicam*, https://medlineplus.gov/druginfo/meds/a601242.html.

Moreover, the two questionnaires filled out by Dr. Das (dated December 2012 and May 2014) were generally consistent with each other, regarding the extent of Plaintiff's postural and non-exertional impairments, even though one of the questionnaires pre-dated Plaintiff's spinal fusion surgery, and the other post-dated it. In the 2012 questionnaire, Dr. Das indicated that Plaintiff could only sit or stand/walk for a total of six hours in an eight-hour day (*see id.* at 779), an immaterial difference from the five hours that Dr. Das later indicated. Also, much like his later assessments, Dr. Das indicated on the 2012 questionnaire that Plaintiff had "constant" pain, which Dr. Das described at the time as "severe," "sharp," and "aching," and as "made worse by activity," as well as by "prolonged sitting/standing" (*id.* at 778-79), that Plaintiff's "pain or other symptoms" were "frequently" "severe enough to interfere with attention and concentration" (*id.* at 780), that Plaintiff was incapable of tolerating even low work stress (*id.* at 781), and that Plaintiff was likely to be absent from work two to three times per month (*id.*). In the 2012 questionnaire, Dr. Das also opined that, at that time, Plaintiff's condition interfered with his ability to keep his neck in a constant position, as might be required to look at a computer screen, or to look down at a desk. (*Id.*)[46]

Notably, Dr. Das's final report – his July 2014 letter to the ALJ – does not address any of Plaintiff's non-exertional limitations, such as pain, side effects of pain medication, or a need to be absent from work a certain number of days per month. Although a copy of the request for clarification that was sent to Dr. Das by the ALJ does not appear to be included in the Record, it seems that the ALJ may have only sought clarification regarding certain exertional and perhaps

---

[46] The types of opinions expressed in the two questionnaires were also largely echoed by Dr. Das's February 2013 opinion, in which he again noted Plaintiff's "severe pain that is aggravated by any activity," as well as by sitting or standing. (*See id.* at 702 (stating, at that point, that Plaintiff could not "sit or stand for longer than 30 minutes without experiencing pain").)

postural impairments, as Dr. Das's letter only discusses "lifting, carrying, pushing, pulling, repetitive movements and prolonged sitting/standing on a continued basis," all of which, he noted, were generally to be avoided by Plaintiff, as such activities would "cause stress to the spine." (*Id.* at 1134.) Given this narrow focus of the July 2014 letter, Defendant misses the point in asserting that the particular restrictions referenced in that letter – including Dr. Das's apparent agreement with the consulting neurosurgeon, Dr. Levy, that Plaintiff should not lift more than 10 pounds or engage in frequent turning, lifting, bending, or lifting above shoulder level – were "consistent with [ability to perform] a range of sedentary work" as defined in 20 C.F.R. § 404.1567(a). (Joint Stip., at 14-15 (citing R. at 1134-35).) Although this Court acknowledges that Dr. Das had previously opined that Plaintiff was somewhat more restricted with respect to lifting and carrying weight (compare July 2014 letter (referencing a "10-15 pound weight restriction") with earlier questionnaires (stating that Plaintiff could frequently lift or carry up to five pounds, and occasionally lift or carry up to 20 pounds)), the biggest take-away from a side-by-side comparison of the July 2014 letter and Dr. Das's earlier opinion evidence is not that the evidence is inconsistent, but rather that the final letter is simply silent as to several of the types of impairments discussed previously. Under these circumstances, it was error for the ALJ to give controlling weight to Dr. Das's July 2014 letter, while nearly entirely dismissing the value of *all* of the earlier opinion evidence submitted by the same treating physician. *Cf. Bryant v. Berryhill*, No. 16-CV-6109-FPG, 2017 WL 2334890, at *5 (W.D.N.Y. May 30, 2017) (where treating physician provided several opinions, it was not error for the ALJ to discount a single one of those opinions, which was not consistent with the record "as a whole"). Additionally, the ALJ erred to the extent he assigned *any* weight to Dr. Das's seeming agreement with Dr. Levy that Plaintiff "should currently be able to do light duty work" (R. at 1134), as, just

as a determination that a claimant *cannot* work is a determination reserved to the Commissioner, so is a determination that a claimant *can* work, at any particular exertional level, and in light of his postural and non-exertional impairments. *Cf. Snell*, 177 F.3d at 133.

Defendant's additional argument, that Dr. Das's opinions from December 2012 to May 2014 were not supported by the totality of the available medical records from that period (Joint Stip., at 15), while his July 2014 letter was "consistent with the record evidence" (*id.*, at 12-13) is also unpersuasive. In suggesting that various medical notes and reports within the Record contain normal findings regarding, *inter alia*, Plaintiff's strength and motor functions, Defendant fails to acknowledge that those very same reports also contain significant positive findings of exertional and/or non-exertional impairments. For example, Defendant cites to the Record at pages 480 and 695 to support the conclusion that "following his May 2012 back surgery, Plaintiff was neurologically intact, had near-to-full strength in the upper and lower extremities, and intact grasp and fine motor function." (Joint Stip., at 15.) The first of these pages is part of a November 9, 2012 occupational therapy evaluation performed at Westchester Medical Center, after Plaintiff's hip surgery. (*See* R. at 479-80.) Although this evaluation notes that Plaintiff had, for example, intact fine motor coordination, it also indicates that Plaintiff was using crutches at the time, that he was reporting pain of 8/10 in his right hip when moving, and that he had decreased range of motion in the hip. (*Id.*) Further, as this evaluation only included a functional assessment for range of motion and strength in Plaintiff's joints (*see id.*), it is not probative regarding any potential spinal impairments.

The second of Defendant's cited pages (*id.* at 695) is to one examination report by the orthopedic surgeon, Dr. Lazzarini, who performed surgeries on Plaintiff's hip and knee. In that particular document, dated July 13, 2012, Dr. Lazzarini noted Plaintiff's report that his back pain

"did improve" with a "2-level discectomy" that had been performed by Dr. Das, but that he still "had persistent groin pain and pain that radiated down the medial aspect of the thigh into the medial knee." (*Id.*) Upon physical examination, Dr. Lazzarini found no "trochanteric tenderness to palpation" and "no focal deficits," but he also found that Plaintiff walked with a limp, had pain with right-hip flexion beyond 95 degrees, had "limited rotation at flexion," had "20 degrees of internal rotation and 15 degrees of external rotation with grossly positive impingement," and a "moderate" result on FABER testing (*i.e.*, testing for flexion, abduction, and external rotation). (*Id.*) On review of Plaintiff's hip X-rays, Dr. Lazzarini's found "positive Cam type FAI."[47] Moreover, while not cited by Defendant, the full record of Dr. Lazzarini's progress notes reflect (1) that Plaintiff consistently reported hip and knee pain following that July 2012 visit, with positive clinical findings in the hip leading to his hip surgery in November 2012 (*see id.* at 695-96, 591, 589, 498), and (2) that, after that surgery, while Plaintiff reported improvement in the hip, he reported consistent and worsening knee pain, which, again based on positive clinical findings, as well as lack of improvement with conservative treatment (including a series of injections), led Dr. Lazzarini to perform knee surgery in August 2014 (*see id.* at 676, 1120-33, 1539-41). Moreover, for a substantial period of time leading up to that knee surgery – and well past a year from Plaintiff's claimed disability onset date of May 26, 2012 – Dr. Lazzarini repeatedly noted Plaintiff's difficulty with both sitting and walking (*see, e.g.*, *id.* at 1123 (note dated Sept. 20, 2013 that Plaintiff "is clearly uncomfortable while sitting, keeps his leg in an

---

[47] Cam impingement, in which the femoral head "cannot rotate smoothly inside the acetabulum" of the hip joint, is a subtype of femoroacetabular impingement ("FAI"). *Femoroacetabular Impingement*, https://orthoinfo.aaos.org/en/diseases-- conditions/femoroacetabular-impingement. FAI is "a condition in which extra bone grows along one or both of the bones that form the hip joint – giving the bones an irregular shape. Because they do not fit together perfectly, the bones rub against each other during movement. Over time this friction can damage the joint, causing pain and limiting activity." *Id.*

extended position," and that "ambulation . . . causes significant pain in the medial aspect of the knee with locking and catching"), 1125 (note dated Jan. 22, 2014 that Plaintiff "is still using the cane and has a significant limp")).

Defendant also cites pages 693, 703, and 745 of the Record to support the proposition that "[t]reating neurologist Dr. Jin Li also reported that Plaintiff was neurologically intact, had full strength in the upper and lower extremities, and intact grasp and fine motor function." (Joint Stip., at 15.) At those same points in the Record, however, Dr. Li made findings that, even after experiencing improvement following back surgery and relief from a series of trigger point injections, Plaintiff still had "muscle spasm of [paraspinal] of L5 and lower thoracic levels," with pain to his "lateral thigh" (R. at 693); that he had "persistent lumbar radiculopathy with muscle spasm not responsive to treatment," and was "still in significant pain" (*id.* at 703-04); and that he had limited range of motion, tenderness, muscle spasm, and sensory loss in his lumbar region, with "constant" lower back pain (*id.* at 745-46).

Defendant additionally refers to isolated treatment notes from Dr. Thomas Booker, of Crystal Run (Joint Stip., at 16 (citing R. at 1199, 1142-43, and certain duplicate pages)), and two pages from Marks' records (*id.* (citing R. at 1168-69), purportedly to demonstrate Plaintiff's history of unremarkable findings. As with the reports of Drs. Lazzarini and Li, Defendant highlights only select portions of Dr. Booker's records, such as his findings of normal flexion and extension in Plaintiff's lower extremities, while disregarding the doctor's references, in the exact same records, to Plaintiff's decreased range of motion in his back, where, fully a year after his spinal fusion surgery, he showed "[m]arked pain" with both flexion and extension (R. at 1199); Dr. Booker also noted, in the cited pages, Plaintiff's abnormal gait and stride (*id.*; *see also id.* at 1142), his reports of 8/10 pain (*id.* at 1142), and his use of narcotic pain medication (*id.*).

Similarly, with respect to the cited record of Marks, Defendant seems to focus on certain normal strength and flexibility findings, while ignoring other findings that were consistent with Plaintiff's reports of pain – including findings of bilateral tenderness to palpation over his paraspinal, thoracic, and lumbar muscles and processes. (*Id*. at 1168-69.)[48]

Defendant also cites the results of certain imaging studies, including Plaintiff's November 2012 lumbar spine MRI, which, according to Defendants, showed "no change in disc degeneration" since January 2012, nor disc herniation or "significant stenosis" (Joint Stip., at 16 (citing R. at 771)); a November 15, 2012 X-ray, which, according to Defendant, showed stable debridement in Plaintiff's right hip (*id.* (citing R. at 676)); and a lumbar computerized tomography ("CT") scan from December 16, 2013, which, according to Defendant showed "no complicated features and evidence of fusion across the disc space" (*id.* (citing R. at 753)). Defendant contends that "[s]uch diagnostic findings show no progression of a musculoskeletal or other condition that undermined the ALJ's RFC finding." (*Id.*) Again, however, Defendant has cherry-picked the evidence, failing to mention references in the Record to the several positive

---

[48] To the extent Defendant also seeks to rely on reports of consulting examiners Drs. Puri and Levy (*see* Joint Stip., at 15-16) to discredit Dr. Das's opinions, this Court only notes that findings by one-time consultants should not serve to undermine the legitimacy of Dr. Das's reported findings, made over an extensive course of treatment that included two surgeries. *See Selian*, 708 F.3d at 419 ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."). The progress notes underlying Dr. Das's stated opinions reflect paraspinal muscle spasm and abnormal EMGs prior to Plaintiff's back surgery in May 2012 (*see* R. at 809-10); then, after initial post-surgical improvement (*id.* at 811-12), his progress notes reflect Plaintiff's steady worsening of back pain despite physical therapy and trigger point injections, with pain radiating down his right leg and continued lumbar paraspinal muscle spasm (*id.* at 813-14), a positive lumbar MRI (*id.* at 815), and pain on flexion and extension in his lower back (*id*. at 816), all leading to Plaintiff's further back surgery on May 30, 2013; after that, Dr. Das's notes indicate that Plaintiff again initially reported improvement (*id.* at 816-20), but that, after a few months, he again reported worsening pain, leading Dr. Das to request an MRI of the thoracic spine that was denied by Plaintiff's insurance carrier, and eventually to prescribe additional narcotic pain medication in March and April 2014 (*see id*. at 821-25).

imaging and other studies over the same time period, including, for just a few examples, a March

2012 EMG that reportedly showed "electrophysiological evidence of chronic L-5 radiculopathy"

(*id*. at 773); an MRI scan which, according to notes by Dr. Das dated December 12, 2012,

reflected "persistent degenerative disc disease, disc herniations, loss of disc height at L3-L4, L4-

L5, and L5-S1[, with] . . . Modic changes at these levels as well" (leading Dr. Das to note that

prior surgery has "failed," and to request authorization to perform further surgery) (*id.* at 815); a

lumbosacral spine X-ray in March 2013 that reportedly showed "[d]egenerative changes" (*id*. at

721); "[i]maging studies" (not specified) prior to Plaintiff's May 30, 2013 lumbar spine surgery

"showed lateral recess stenosis with herniated disc and foraminal narrowing" (*id.* at 1117); an

MRI of the cervical spine, probably taken sometime between April 9 and June 2, 2014 (the

original imaging study does not appear to be in the Record), which, as described by Dr. Das,

showed "disc herniations at C3-C4 and C4-C5, more significant at C3-C4 causing some

compression of the ventral epidural space" (*id.* at 369); and the several radiographs and X-rays

discussed by Dr. Lazzarini from November 2012 through June 2014, which revealed positive

findings in Plaintiff's hip and then in his knee, in both instances leading to the need for surgical

intervention (*see id.* at 589, 1126, 1132, 1133). *See Tim v. Colvin*, No. 6:12-CV-1761 GLS/ESH,

2014 WL 838080, at *7 (N.D.N.Y. Mar. 4, 2014) ("[A]n administrative law judge may not

'cherry-pick' medical opinions that support his or her opinion while ignoring opinions that do

not." (citing *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011))); *see also Knorr v. Colvin*,

No. 6:15-CV-06702 (MAT), 2016 WL 4746252, at *13-*15 (W.D.N.Y. Sept. 13, 2016)

(reviewing underlying medical evidence and treatment notes in analyzing whether ALJ's

decision to discount opinion evidence of treating physician was supported by substantial

evidence).

Overall, this Court does not perceive a validly explained basis in the ALJ's decision for his assigning of only "little weight" to all of Dr. Das's first four opinions, and particularly to the two questionnaires he provided. This error in the application of the treating physician rule was significant and warrants remand, as, had several of the findings itemized in Dr. Das's questionnaires been given "controlling" or any kind of substantial weight, then it is likely the ALJ's ultimate decision on disability would have been impacted. At a minimum, if the ALJ had credited those questionnaires, then he would have needed to pose additional questions to the VE regarding the availability of jobs in the national economy for a claimant who could only sit and stand/walk for a combined total of five or six hours in an eight-hour in a workday, and who had non-exertional impairments that included pain that required him to take frequent rests, side effects from pain medication (including drowsiness and impaired concentration),[49] and likely regular absences from work.

### b. Dr. Cabisudo

Plaintiff also challenges the ALJ's assignment of "little weight" to the opinion evidence of Plaintiff's psychiatrist, Dr. Cabisudo, claiming that the ALJ improperly substituted his lay opinions for that of this professional. In particular, Plaintiff contends that the ALJ should have assigned greater weight to Dr. Cabisudo's April 2014 questionnaire, in which the doctor stated that he had diagnosed Plaintiff with generalized anxiety disorder, with a "fair to poor" prognosis. (*See* Joint Stip., at 9, 12; R. at 859.) In that questionnaire, Dr. Cabisudo also opined that Plaintiff

---

[49] This Court does not find that the ALJ's inclusion, in the hypotheticals posed to the VE, of a restriction to performing "simple, routine, [and] repetitive work" (R. at 116-17) was sufficient to take into account the limitations that even the ALJ found in Plaintiff's ability to maintain concentration, persistence, and pace. *See Hendrickson v. Astrue*, No. CIV.A. 5:11-927, 2012 WL 7784156, at *9 n.14 (N.D.N.Y. Dec. 11, 2012), *report and recommendation adopted*, No. 5:11-CV-0927 LEK/ESH, 2013 WL 1180864 (N.D.N.Y. Mar. 20, 2013) (collecting cases); *see also* R. at 33 (finding Plaintiff to have a moderate impairment in this ability).

had symptoms of depression, anxiety, anhedonia,[50] and low energy, and a number of resulting moderate and marked mental impairments, as well as episodes of decompensation, rendering it likely that he would be absent from work more than three times per month. (R. at 860-65.) Although Dr. Cabisudo's treating relationship with Plaintiff was not as longstanding as that of Dr. Das, Dr. Cabisudo similarly qualified as a "treating physician" for purposes of the treating physician rule, having apparently seen Plaintiff at least 12 times between April 17, 2013 (R. at 739-41) and April 8, 2014.[51] Thus, absent a lack of expressly stated "good reasons" for discounting Dr. Cabisudo's opinions, such as a lack of supporting evidence in the medical record, the ALJ was required to assign them controlling weight. Here, the ALJ stated that he found Dr. Cabisudo's opinions to be "inconsistent with his own treatment records[,] which never noted the degree of depression or anxiety required to render [Plaintiff] totally unable to perform [certain] functions" (*id.* at 43-44), and that Plaintiff's own "admitted activities," as well as other evidence in the Record, constituted substantial evidence that did not support Dr. Cabisudo's expressed opinions (*id.* at 44.).

On the one hand, this Court agrees with Defendant that there was substantial evidence in the Record, including in Plaintiff's submissions and Dr. Cabisudo's own treatment notes, which supported the ALJ's findings regarding Plaintiff's adequate mental functioning in a number of respects. As set out above, Plaintiff indicated, in his written statements, that, among other things, he was able to follow instructions, interact with people in positions of authority, and get along with others. (*See id*. at 269-70.) In addition, it is correct, as Defendant points out (*see* Joint

---

[50] Anhedonia is the "inability to experience pleasure in normally pleasurable acts." *Anhedonia*, https://www.merriam-webster.com/dictionary/anhedonia.

[51] Although the Record does not contain a progress note from Dr. Cabisudo for April 8, 2014, the doctor indicated in his questionnaire that he had seen Plaintiff on that date. (R. at 859.)

Stip., at 17-18), that Dr. Cabisudo's mental status exams regularly reflected that Plaintiff was cooperative, that he was alert and fully oriented, and that he had logical thought process, good impulse control, and at least fair judgment and insight. (R. at 740, 735, 732, 729, 727, 725, 723, 761, 759, 757.)

On the other hand, as Plaintiff argues (Joint Stip., at 11), it appears that the ALJ erred in what seems to have been a key finding that underlay his decision to discount the entirety of Dr. Cabisudo's opinion evidence – *i.e.*, the finding that, "[t]hroughout 2013 and 2014, Dr. Cabisudo recorded several *normal* mental status exams [for Plaintiff] except for 'fair' judgment and insight" (R. at 44 (emphasis added) (citing 723-41, 755-62); *id.* at 39). Earlier in his decision, the ALJ himself acknowledged that Dr. Cabisudo had found Plaintiff to be anxious and depressed (*id.* at 39-40), and a review of Dr. Cabisudo's progress notes over the course of his relationship with Plaintiff reveals that, in every single mental status exam he conducted, Dr. Cabisudo recorded that Plaintiff presented with "anxious," or with "anxious" and "depressed," mood (*see id.* at 740, 735, 732, 729, 727, 725, 723, 761, 759, 757, 755), only once showing "some improvement" of anxiety (*id.* at 723). Throughout the period that Plaintiff was under his psychiatric care, Dr. Cabisudo prescribed Plaintiff medication for anxiety and/or depression, starting him with Viibryd[52] on April 17, 2013 (*id.* at 740), increasing the dose of Viibryd on May 1, 2013 when Plaintiff "present[ed] with no improvement of anxiety, mood" (*id.* at 735), switching to Klonopin[53] on May 23, 2013 when Plaintiff did not respond to Viibryd (*id.* at 732), discontinuing Klonopin on May 29, 2013 because Plaintiff was unable to tolerate it and

---

[52] Viibryd is a brand name of the drug vilazodone, a selective serotonin reuptake inhibitor ("SSRI") used to treat depression. *Vilazodone*, https://medlineplus.gov/druginfo/meds/a611020.html.

[53] Klonopin is a brand name of the drug clonazepam, a benzodiazepine prescribed to treat panic attacks. *Clonazepam*, https://medlineplus.gov/druginfo/meds/a682279.html.

was soon scheduled for surgery (*id.* at 729), starting Plaintiff on Xanax[54] on June 19, 2013 (*id.* at 727), switching Plaintiff to Cymbalta[55] on July 17, 2013 (*id.* at 725), increasing the dose of Cymbalta on August 14, 2013, after Plaintiff showed some improvement (*id.* at 723), continuing medication on September 10, 2013, when Plaintiff "present[ed] with decompensation of anxiety" (*id.* at 761), increasing the dose of Cymbalta again on October 14, 2013, when Plaintiff again "present[ed] with decompensation of anxiety" (*id.* at 759), adding Wellbutrin[56] on December 4, 2013, when Plaintiff again "present[ed] with decompensation of anxiety" (*id.* at 757), and increasing the dose of Wellbutrin on February 4, 2014, when Plaintiff "present[ed] with no improvement of mood, of anxiety" (*id.* at 755).

In light of this evidence of Dr. Cabisudo's regular recording of partially *abnormal* mental status exams, and his continuous medical treatment of Plaintiff for persistent manifest anxiety, it is difficult to accept the ALJ's statement that Dr. Cabisudo's opinions were inconsistent with his own treatment records, and that this justified assigning his opinions only little weight. Further, to the extent the ALJ posited that Dr. Cabisudo's opinions were not supported by the records of other treatment providers, the fact that Plaintiff's non-mental-health providers at Crystal Run may not have observed depression or anxiety (*see id.* at 39, 40 (ALJ citing Crystal Run records)) would seem to be less telling. In any event, to the extent the ALJ weighed Dr. Cabisudo's

---

[54] Xanax, or alprazolam, is another benzodiazepine used to treat anxiety and panic disorders. *Alprazolam*, https://medlineplus.gov/druginfo/meds/a684001.html.

[55] Cymbalta is a brand name of duloxetine, which may be used to treat depression, generalized anxiety disorder, or ongoing bone or muscle pain, such as lower back pain or osteoarthritis. *Duloxetine*, https://medlineplus.gov/druginfo/meds/a604030.html. Plaintiff was also prescribed Cymbalta for pain management by Crystal Run physicians. (*See* R. at 86 (Plaintiff's testimony on May 20, 2014 that he took Cymbalta "for nerve pain and for depression"), 1166 (April 17, 2014 note of Marks listing Cymbalta as a pain management drug).)

[56] Wellbutrin, a brand name of the drug bupropion, is an antidepressant. *Bupropion*, https://medlineplus.gov/druginfo/meds/a695033.html.

opinions against the reports of any non-psychiatric treatment providers, their expertise (or lack thereof) in mental health care should have been taken into account.

Additionally, this Court is aware of no basis in fact or law for Defendant's seeming suggestion that the ALJ was permitted to discount Dr. Cabisudo's opinions regarding Plaintiff's anxiety and depression because Plaintiff's diagnosed anxiety disorder was derived from "situational" stressors, such as his "financial situation, his mother's cancer diagnosis, and relationship issues with his daughter" (Joint Stip., at 18), rather than, as the ALJ put it, from "any mental abnormality" (R. at 40). If Plaintiff suffered from anxiety and depression, then the relevant inquiry is not *why* he had those conditions, but rather whether his anxiety and depression, alone or in combination with his other impairments, impacted his RFC in a meaningful way.

Finally, Plaintiff rightly takes issue with the ALJ's assertion that Plaintiff's "admitted activities" (described by the ALJ as "traveling independently, caring for his daughter, and managing his own finances") constituted a good reason for finding that Plaintiff did not have significant mental impairments. (*See* Joint Stip., at 11 (quoting R. at 44).) First, as discussed further below (*see* Discussion, *infra*, at Section III(B)(3)), this Court does not accept that the ALJ fairly characterized Plaintiff's purported "admissions" regarding his activities. Second, to the extent Plaintiff was in fact able to engage in certain activities of daily living, this alone would not demonstrate that he was capable of sustaining substantial gainful activity. *See Gold v. Sec'y of Health, Ed. & Welfare*, 463 F.2d 38, 41 n.6 (2d Cir. 1972) ("To receive benefits under the Social Security Act, one need not be completely helpless or unable to function." (citation omitted)). Third, in any event, impairments that may result from an anxiety disorder, such as an inability to maintain concentration, persistence, and pace, to respond well to criticism, or simply to get

through a work day without episodes of deterioration or decompensation relating to anxiety, are not necessarily incompatible with the ability to engage in certain personal activities.

Based on the above, this Court recommends that, upon remand, the ALJ be instructed not only to re-evaluate, under the treating physician rule, the weight that should be assigned to Dr. Das's first four opinions regarding Plaintiff's physical limitations, but also the weight that should be accorded to Dr. Cabisudo's opinions regarding Plaintiff's mental impairments.  In addition, the ALJ should be directed to seek any additional treatment records from Dr. Cabisudo that could place in context and shed light on his October 6, 2014 note, which, as noted above (*see* Background, *supra*, at Section B(3)), references severe mental health issues, well beyond what was reflected in his earlier treatment records.

### 2.      Claimed Failure To Develop the Record

With respect to the ALJ's duty to develop the Record, Plaintiff points out that, while the ALJ assigned "great weight" to the opinion of Marks that Plaintiff could not return to his past work, the ALJ also noted that Marks had not provided a "function-by-function assessment of basic work activity."  (Joint Stip., at 23 (quoting R. at 42).)  According to Plaintiff, this comment by the ALJ highlighted a "gap" in the medical evidence that required the ALJ to seek additional information.  (*Id*.)  This Court, however, perceives no error in this regard.

"[R]emand is not necessary merely because an explicit function-by-function analysis was not performed," and the ALJ's decision otherwise reflects application of "the correct legal standards [and] is supported by substantial evidence."  *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).  Here, the fact that Plaintiff could not return to his past work as a heavy equipment mechanic is not in dispute, and the ALJ was not required to solicit a function-by-function assessment from Marks justifying her opinion that Plaintiff could not return to that

previous work.  *See Sink v. Colvin*, No. 1:12-CV-00239 JJM, 2015 WL 3604655, at *17 (W.D.N.Y. June 8, 2015) ("A medical source's opinion that does not address every function with respect to physical limitations is not invalid or insufficient.  A function-by-function analysis is unnecessary.").

As set out above, however, the Record contains a note from Dr. Cabisudo, dated October 6, 2014, which describes Plaintiff as having comparatively extreme mental-health symptoms (including, *inter alia*, "severe desponden[ce]," "suicidal ideation," "severe anxiety," and an inability "to take care of himself medically") (R. at 1542), but there are no underlying treatment records from Dr. Cabisudo in the Record for any time from February 2014 to the date of that note, although Dr. Cabisudo's questionnaire indicates he saw Plaintiff on April 8, 2014. (*See id.* at 859.)  In the absence of such treatment records, this Court is unable to ascertain whether the medical opinions stated in Dr. Cabisudo's October 6, 2014 note are supported by any contemporaneous clinical findings that he may have made.  Accordingly, upon remand, and in connection with re-evaluating the weight that should be accorded to Dr. Cabisudo's opinions, the ALJ should be directed to make an attempt to develop the Record further, so as to obtain the treatment records of Dr. Cabisudo from February 2014, forward.

### 3.  Claimed Error in the ALJ's Credibility Determination

Plaintiff argues that, while the ALJ mentioned the factors relevant to the credibility inquiry,[57] he did not take those factors into consideration when he found that Plaintiff's

---

[57] As set out above, the factors that an ALJ should consider in evaluating the claimant's credibility include:  (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than medication, that the claimant has received for relief of the symptoms; (6) any other measures that the claimant employs to relieve the symptoms; and (7) other factors

"statements concerning the intensity, persistence, and limiting effects of [his] symptoms [were] not entirely credible." (Joint Stip., at 27 (citing R. at 35).) Plaintiff also claims that the ALJ erred in discounting Plaintiff's complaints of pain and of pain-related limitations, based on a mischaracterized and cherry-picked account of the medical record, and a failure to credit the opinions of Dr. Das, in particular, with respect to Plaintiff's physical restrictions. (*See generally id.*, at 27-29.) This Court agrees that the ALJ's assessment of Plaintiff's credibility was infected by the ALJ's improper weighing of the opinion evidence, particularly that of Dr. Das, and that, while Defendant is correct that the ALJ was "not required to discuss every piece of evidence submitted" (Joint Stip., at 31), the evidence that the ALJ chose to discuss in his credibility evaluation did not accurately portray the medical record as a whole.

First, as a general matter, the ALJ's errors with respect to the application of the treating physician rule, as discussed above, cannot be viewed as divorced from his assessment of Plaintiff's credibility. If, for example, the ALJ erred in discounting Dr. Das's medical opinions as to how long Plaintiff could sit or stand at a time, without needing to rest, or regarding the total amount of time that Plaintiff could sit and/or stand in the course of a work day (*see* Discussion, *supra*, at Section III(B)(1)(a)), then the ALJ similarly erred to the extent he discredited Plaintiff's testimony in this regard, based on a supposed lack of support in the medical record. Plaintiff gave extensive testimony as to how difficult and painful it was for him to shift from a sitting to a standing position and back again (*see, e.g.*, R. at 79-80, 88, 107, 110), and further testified that his pain tended to increase in the late afternoon, when he would tend to "get very stiff" in his

---

concerning the claimant's functional limitations and restrictions as a result of the symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *see* Discussion *supra*, at Section I(E).

back (*id*. at 112). Had the ALJ found a sufficient basis for crediting that testimony, he may have determined that Plaintiff could not hold a full-time job.

Second, to the extent the ALJ's credibility determination rested on his finding – repeated several times in his decision – that the medical record reflected "improvement" in Plaintiff's physical conditions (*see, e.g*., *id*. at 36 ("medical images of [Plaintiff's spine . . . show improvement after each surgery"), 38 ("[Plaintiff's] treatment history . . . shows gradual improvement")), this Court notes that the ALJ was tasked with determining whether there was any continuous, 12-month period from May 26, 2012 (Plaintiff's alleged onset date) to December 31, 2016 (his date last insured), in which he was unable to work. Accordingly, the question of whether Plaintiff's allegedly disabling conditions had improved is immaterial, unless Plaintiff's condition had improved before 12 months had elapsed within the relevant time period. In discrediting Plaintiff's claims of disability because of his supposed "improvement," the ALJ failed to examine the question of when the supposed improvement occurred, and whether it would have precluded a finding of disability for 12 months during the relevant time.

Third, fairly recounted, the progression of Plaintiff's treatment for back pain does not show sustained improvement from surgery or other treatment. Certainly, if Plaintiff's back pain had resolved following the surgical procedures he underwent in May 2012, then one would not have expected him to proceed to more extensive back surgery (*i.e.*, spinal fusion surgery) on May 30, 2013 – more than a year from his claimed onset date. Similarly, it is difficult to see how the medical record could support a conclusion that Plaintiff's knee pain improved, when, after several injections (starting as early as October 2012 (*see id*. at 591)) and physical therapy,

Plaintiff finally resorted to surgery in August 2014.[58]  As an aside here, this Court also finds

improper, and indeed baffling, the ALJ's seeming reliance on the fact that, in his words,

"[Plaintiff] was . . . able to attend three challenging physical therapy sessions a week for the

entirety of the affected period, performing exercises and limited physical tasks" (*id*. at 39) as a

basis for discrediting Plaintiff's testimony regarding the extent of his physical impairments.  This

is not a situation where a claimant has *failed to seek treatment* for his claimed impairments,

thereby calling his credibility into question.  *See, e.g.*, *Collier v. Colvin*, No. 15-CV-230-FPG,

2016 WL 4400313, at *3 (W.D.N.Y. Aug. 17, 2016) (plaintiff's failure to seek follow-up

treatment "indicated higher physical functioning than [plaintiff] alleged in his application.");

*Miller v. Colvin,* 85 F. Supp. 3d 742, 755 (W.D.N.Y. 2015) ("An ALJ is permitted to consider a

[p]laintiff's failure to seek treatment for alleged disabilities when evaluating a [p]laintiff's

credibility with respect to statements of the extent of the impairments.") (citations omitted);

*Arnone,* 882 F.2d at 39 (plaintiff's failure to seek treatment "seriously undermine[d]" his claim

of disability).  Regardless of the "challenge" that may be posed by a lengthy course of physical

therapy, surely a claimant's tolerance for *undergoing treatment* cannot itself speak to the

question of whether he has credibly described the impairments that led him to pursue that

treatment.

Fourth – and also with respect to a matter addressed by Dr. Das in one of the opinions

discounted by the ALJ – the ALJ neglected to consider, in his credibility assessment, Plaintiff's

---

[58] As to his knee pain, Plaintiff argues persuasively that the ALJ improperly "pick[ed]
and ch[o]se" from the medical record when, for example, he relied on a April 2013 statement by
Dr. Lazzarini that Plaintiff had not experienced "instability" in his knee (Joint Stip., at 28 (citing
R. at 38)), while ignoring numerous statements in the same medical report, from the same doctor,
regarding Plaintiff's "specific [pain] along the medial joint line and patella," his "difficulty
reciprocating stairs," his "difficulty with prolonged sitting and anterior knee pain," and his "pain
with rotation with the foot in a planted position referable to the medial joint line" (R. at 1121).

reported side effects from medication.  The applicable regulation specifies that this is a factor relevant to determining a claimant's credibility.  (*See supra*, at n.57.)  As noted above, during the period under review, Plaintiff was prescribed a variety of narcotic pain medications and muscle relaxants (in addition to anti-anxiety drugs), and Plaintiff testified that he experienced side effects from medication that included fatigue and an impaired ability to concentrate.  (*See id*. at 109 (Plaintiff testifying that his medications made him "very tired" and "cloudy"), 113 (testifying that the cloudiness was "all the time since the medication," and that he was finding that he needed to "tak[e] an energy drink just to function in life"), 272 (reporting side effect of fatigue, as well as stomach pain and diarrhea).)  Although, as noted above, the ALJ found, at one point in his decision, that Plaintiff had "moderate limitations" in concentration, persistence, and pace (*id.* at 33), the ALJ never expressly considered Plaintiff's specific reports of medication side effects, much less considered them in light of Dr. Das's records or opinions.

Finally, to the extent the ALJ found that Plaintiff's assertions of disability lacked credibility because of Plaintiff's supposed "admissions" regarding the activities in which he was able to engage, the ALJ largely mischaracterized Plaintiff's statements or disregarded the qualifiers that Plaintiff included in those statements.  For example, the ALJ stated that Plaintiff had "admitted that he [was] able to perform light chores, take care of his daughter, care for pets, manage his own personal care with some adjustments, cook light meals, and perform yard work and repairs."  (*Id.* at 33 (citing *id.* at 261-80).)  Yet the cited source of these admissions was a written submission made by Plaintiff, in which he actually stated, *inter alia*, that, while he helped his daughter with homework, *she* helped *him* with household chores (*id*. at 263); that, while he could handle some pet care, such as cleaning cat litter and feeding his pets, he was unable to walk the dogs (*id.*; *see also id.* at 266); that, with respect to his personal care, it was "very hard"

for him to get dressed (*id.* at 263), that he "sometimes need[ed] help putting socks and pants on" (*id.* at 264), that he "[could] not wash below the knee properly" (*id*. at 263), and that sitting for periods of time on the toilet "present[ed] problems [with] getting up [and] numbness" (*id.*); that cooking was "sometimes problematic," such that he was only able to fix meals that could be "prepared quickly" or were "take out" meals, and that he sometimes could not prepare meals at all due to his pain (*id.* at 264); and that he could no longer fully take care of his property, as he had done prior to his alleged disability (*id.* at 265; *see also id*. (stating that his yard and housework were "limited due to pain [and] injuries")). For another example, while the ALJ stated that, "[i]n August of 2012, [Plaintiff] admitted that he was able to sit for many hours" (*id*. at 39 (citing *id*. at 906)), in the referenced record, Plaintiff was actually reported to have stated that he "exacerbated his condition since visiting his friend in the hospital and spending 10+ hours sitting" (*id*. at 906) – suggesting that he had *not* been able to sit for so long without adverse physical consequences.

In sum, this Court rejects Defendant's contention that the ALJ properly exercised his discretion "in weighing the credibility of [Plaintiff's] testimony in light of the other evidence in the [R]ecord." (Def. Mem., at 32 (citing *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)).) Instead, this Court finds that the problems it has identified with the ALJ's assessment of Plaintiff's credibility also warrant remand.

### 4.      **Claimed Improper RFC Assessment**

As a corollary to his other arguments, Plaintiff argues that the ALJ erred in making his RFC assessment, which, according to Plaintiff, was "a product of his selective assessment of the evidence." (Joint Stip., at 34.) Plaintiff further contends that the ALJ failed to consider the cumulative limiting effects of Plaintiff's impairments in combination when assessing his RFC.

(*Id.*) Citing Dr. Das's opinion that Plaintiff was unable to concentrate due to pain (R. at 780, 798); could not kneel, bend, or stoop (*id.* at 782, 799); and would likely be absent from work (*id.* at 781, 799), Plaintiff argues that "numerous impairments and limitations [were] unmentioned or revised by the ALJ to conform to his view of the medical record" (Joint Stip., at 35). Plaintiff also argues that "few, if any[,] of the limitations found in [Dr. Cabisudo's] Psychiatric/Psychological medical source statement found their way into the RFC or into the hypotheticals proffered to the [VE]." (*Id.*)

This Court agrees that, to the extent the ALJ erred in weighing the medical opinion evidence provided by Dr. Das and Dr. Cabisudo – and, either as a result or in addition, erred in assessing Plaintiff's credibility – his RFC analysis cannot independently stand. *See Perez v. Colvin*, No. 14cv9733 (VB) (JCM), 2016 WL 5956393, at *11 (S.D.N.Y. July 21, 2016), *report and recommendation adopted*, No. 14cv9733 (VB), 2016 WL 5942314 (S.D.N.Y. Oct. 11, 2016) ("In determining an applicant's RFC, the ALJ must apply the treating physician rule"); *Rosa*, 168 F.3d at 82 n.7 ("Because . . . the ALJ was incorrect in her assessment of the medical evidence, we cannot accept her conclusion regarding [plaintiff's] credibility."). As noted above, if Dr. Das's opinion evidence had been accorded controlling weight, then, at a minimum, the ALJ should have posed additional questions to the VE regarding the postural and non-exertional impairments that Dr. Das described. These included an inability to sit and stand/walk for a combined total of eight hours in a workday, the need to take frequent rest breaks, the need for likely absences from work, and drowsiness and impaired concentration resulting from narcotic pain medication. Likewise, if Dr. Cabisudo's opinions had been given controlling weight, then the ALJ should have posed questions to the VE regarding the mental impairments that Dr. Cabisudo described. *See Nebel v. Colvin*, No. 16-CV-6412 (BMC), 2017 WL 5905547, at *2

(E.D.N.Y. Nov. 30, 2017) (ALJ's limited acceptance of treating physicians' opinion evidence "to the extent . . . consistent with [the ALJ's] residual functional capacity [analysis]" was "run-around reasoning" constituting error). Finally, to the extent the ALJ's RFC determination was based on a flawed assessment of Plaintiff's credibility, the determination was itself flawed.

Overall, this Court finds that the ALJ's evaluation of Plaintiff's RFC cannot be considered to have been supported by substantial evidence, in light of the errors identified above, which necessarily fed into that evaluation. Where an RFC determination is not supported by substantial evidence, remand is warranted. *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 439-40 (S.D.N.Y. 2010).

## **CONCLUSION**

For all of the foregoing reasons, I respectfully recommend that, with respect to the Joint Stipulation (Dkt. 16), judgment be entered in Plaintiff's favor, and this case be remanded for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g). I further recommend that, upon remand, the ALJ be directed:

(1)     to make efforts to develop the Record with respect to Dr. Cabisudo's observation, on October 6, 2014, that Plaintiff was "severely despondent, [with] suicidal ideation" (R. at 1542), specifically to endeavor to obtain any and all psychiatric treatment records from February to October of 2014;

(2)     to give controlling weight to the full opinion evidence of Drs. Das and Cabisudo, or to state good reasons for not doing so;

(3)     to reassess Plaintiff's credibility, consistent with applicable regulations and in light of the ALJ's reweighing of the medical opinion evidence;

(4)     to re-evaluate Plaintiff's RFC, in light of any modified determinations as to the weight to be accorded to Drs. Das and Cabisudo and as to the credibility of Plaintiff's testimony and written statements; and,

(5)     at Step Five, to revise the hypotheticals prepared for the VE to include non-exertional, postural, and psychological limitations applicable to Plaintiff's circumstances that are supported by substantial evidence in the Record.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Katherine P. Failla, United States Courthouse, 40 Foley Sq., Room 2103, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to

Judge Failla. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL

RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.

*See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38

(2d Cir. 1983).

Dated: New York, New York
February 20, 2018

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Katherine P. Failla, U.S.D.J.

All counsel (via ECF)

72